**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Jose Efrain TORO, Jr., Michael F. Pickel, Jack Peoples, Mario de la Pava and Robert Edwin Brunk, Jr., Defendants-Appellants.**

No. 87–2117.

United States Court of Appeals,
Fifth Circuit.

March 18, 1988.

Rehearings Denied May 3, 1988.

Ronnie G. Harrison (Court-appointed), Al Harrison, Houston, Tex., for Toro.

Jim Tatum, Houston, Tex., for Pickel.

Darryl G. Campbell, Houston, Tex., for Peoples.

Mervyn Hambur, Atty., Crim. Div., Appellate Section, Dept. of Justice, Washington, D.C., Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for U.S.

Joe L. Hernandez, Houston, Tex. (Court-appointed), for Maria de la Pava.

David Cunningham, Houston, Tex. (Court-appointed), for Robert Edwin Brunk, Jr.

Before GARWOOD, and JONES, Circuit Judges, and HUGHES,[*] District Judge.

EDITH H. JONES, Circuit Judge:

Appellants challenge on numerous grounds their convictions for violating federal narcotics laws. We AFFIRM.

## BACKGROUND[1]

On January 8, 1985, DEA agent Michael Spasaro drove to a Houston hotel where he

---

[*] District Judge of the Southern District of Texas, sitting by designation.

[1] Our recitation of the facts is lengthy because the nature of the crimes involved, the number of participants, and issues raised make extensive presentation unavoidable. We present the facts in the light most favorable to the jury verdict. *United States v. Gardea Carrasco,* 830 F.2d 41, 43 (5th Cir.1987).

was introduced by a confidential informant to defendant Pickel. Pickel understood that Spasaro was a large-scale drug trafficker with sufficient resources to put together a cocaine laboratory. Pickel informed Spasaro that he represented wealthy individuals who were interested in getting into the cocaine business and building a cocaine laboratory. Spasaro advised Pickel that they would need a large secluded ranch and an air strip. At a subsequent January meeting, Pickel wanted to know total costs and whether Spasaro could supply cocaine paste. Spasaro informed Pickel of the total costs (including Spasaro's fee), and said he could supply the cocaine paste. At one point, Pickel said that his clients might have the needed property. The two men again met in April, at which time Pickel advised Spasaro that he was going to the West coast to meet with his clients.

Spasaro never heard from Pickel again until November 26, 1985.[2] On that date Spasaro received a communication on his pager system. Spasaro returned the call, hung up when he noticed the caller was Pickel, and then called Pickel on an undercover phone. Pickel asked if Spasaro could move five tons of "marlboros." Spasaro said he would think about it and asked if the deal involved any "hersheys."[3] Pickel said it might. Spasaro then took three pay telephone numbers from Pickel and said he would call Pickel back.[4] Spasaro called Pickel fifteen minutes later and taped the conversation, during which Pickel asked if Spasaro could move five tons of "smoke" and some "nose stuff."[5] Spasaro expressed interest in the deal and in meeting Pickel's friend who was arranging the deal.

On December 4, 1985, Pickel introduced Spasaro to his "friend," defendant Peoples in Houston. Peoples indicated that he was planning on importing 10,000 pounds of marijuana from Colombia. Since Peoples' buyer only wanted 1,500 pounds, Peoples wondered if Spasaro's people wanted the rest. Spasaro expressed interest and asked whether he could get some cocaine imported as well. Peoples said it might be possible.

Spasaro met with Pickel the next day. Pickel said that Peoples had a lot of connections in Colombia and that he knew the right people. Spasaro agreed to pay Pickel five dollars per pound of imported marijuana if the deal went through. Pickel called Spasaro that night to arrange another meeting with Peoples for the next day. As agreed, the three men again met on December 6 and discussed the possibility of having Spasaro send a large plane or boat to Colombia to pick up a large amount of marijuana or to send a small plane to Colombia to pick up a large amount of cocaine. Peoples agreed to attempt to obtain $50,000–$100,000 to help finance the transportation costs.

During a taped telephone conversation between Spasaro and Pickel on December 9, Pickel referred to a "joint venture on the real estate deal" and a "chocolate factory." Spasaro testified that the phrases were codes for the drug deal and cocaine, respectively, and that Pickel was using code words because he was using his office phone.

Spasaro and DEA agent Nick Console met with Pickel and Peoples on December 11.[6] Peoples said he could not raise $100,-000 but that he was going to go to Colombia to arrange credit for the cocaine deal. Peoples also asked if Spasaro knew any Miami bankers, as some of his Colombian

---

2. Pickel disputed this statement, contending that he and Spasaro discussed business and personal matters on the telephone from April until November every few weeks.

3. "Marlboros" and "hersheys" were code words for marijuana and cocaine, respectively, according to Spasaro.

4. When asked about the significance of these pay telephone numbers, Spasaro testified: "Well, in our business you keep pay phone num-

bers because if you're going to talk about drug activity or illegal activity, you don't want to talk on a phone; you would talk on a pay phone."

5. "Smoke" and "nose stuff" were code words for marijuana and cocaine, respectively, according to Spasaro.

6. Spasaro attempted to tape record the meeting but learned afterwards that his recorder had malfunctioned.

friends in Miami desired to launder cash of up to $1,000,000 daily.[7] Spasaro indicated that he had a cousin who was a Miami banker.

Spasaro and Peoples met alone on December 13. The two focused their attention on importing a load of cocaine and obtaining credit for Peoples. According to Peoples, the Colombians wanted money before the cocaine left the country. Spasaro rejected that plan. Peoples also said he was going to Colombia soon and would be flying through Miami to meet Spasaro's cousin, the banker. Peoples confirmed that he was going to Miami during a taped telephone conversation with Spasaro on December 16. Spasaro and DEA agent Larry Lyons met with Peoples the next day at a hotel near Houston's Hobby Airport. Peoples again confirmed his plans to leave for Colombia the next day and to fly through Miami to meet Spasaro's cousin. He also informed Spasaro that he knew someone who had twenty kilograms of cocaine available. Spasaro and Peoples agreed to split the profit if Peoples could arrange to have the twenty kilograms sent to Houston.

Spasaro, who was flying to Miami separately, agreed to stay in touch with Peoples through Peoples' friend and driver, defendant Toro. During taped conversations with Toro and Peoples on December 18 or 19, Spasaro discussed the possibility that Peoples could meet his banker-cousin at a certain place in Miami and described his cousin. During one of these conversations, Spasaro reminded Peoples to pursue the "bigger offer" with his Colombian contacts. Spasaro testified that the "bigger offer" was a proposed deal where Spasaro and Peoples would attempt to import two hundred kilograms of cocaine, in addition to the second deal to import twenty kilograms.

Spasaro and DEA agent Barnes met with Peoples in Miami on December 24 after Peoples returned from Colombia. Peoples said he had arranged for them to receive five hundred kilograms of cocaine at a cost of $6,500–$7,500 per kilogram.[8] Peoples thought that the Colombians would agree that the money could be placed in a joint safety deposit box in Houston.

Spasaro and DEA agent Console met with Peoples and Toro in Houston on December 30, and Spasaro and Peoples met again the next day. During both meetings the participants discussed the proposed deal to import five hundred kilograms of cocaine and Peoples' planned return to Colombia in January 1986. Spasaro also adamantly refused to send any money to Colombia. Additionally, Spasaro and Peoples discussed whether Peoples' Colombian friends could begin laundering money through Spasaro's cousin in Miami.

Peoples and Spasaro flew to Miami on January 6, 1986, where Peoples met separately with a Colombian friend and with Spasaro and his cousin to discuss money laundering.[9] The two men returned separately to Houston, where they met on January 13 to discuss Peoples' next-day flight to Colombia and plans surrounding the anticipated drug deal.

Spasaro received two pager calls from Pickel on January 20. Spasaro returned the calls and learned that Peoples had returned from Colombia and was trying to reach Spasaro. Later that day, Spasaro met with Peoples. Peoples said he had arranged for a shipment of two hundred kilograms of cocaine, with a tentative pick-up date of February 3. Spasaro was to initially pay $1,300,000 and an additional $1,950,000 two weeks after distribution.

Spasaro and DEA agent Bohman met with Pickel on January 21. Spasaro informed Pickel that he would have some

---

**7.** According to Spasaro, "money laundering" occurs when individuals attempt to deposit large amounts of funds without satisfying certain reporting requirements.

**8.** Spasaro testified that the "street value" of cocaine in Houston in 1985 was $28,000–$35,000 per kilogram.

**9.** The parties never reached a money laundering agreement because Spasaro's cousin demanded a fee higher than the Colombians would pay.

"hersheys" available around February 3. Pickel expressed interest. Spasaro said the price would be $21,000 per kilogram. Spasaro also asked that Pickel furnish a list of his buyers' names before the deal transpired so Spasaro could "check them out" to make sure Pickel was not selling to police.

Spasaro met with Peoples in Miami on January 22. Peoples expressed interest in arranging a meeting in Mexico City between Spasaro and the Colombians to discuss transportation and logistics aspects of the deal. The two men had similar discussions during a meeting in Houston on January 27 after Peoples returned from meeting with the Colombians. During either this meeting or a meeting on February 3, Spasaro learned that the Colombians would not travel to Mexico City because they were wanted by the DEA and feared extradition. The parties thereafter agreed to meet in Aruba.

Spasaro and DEA agent Lyons flew to Aruba on February 6. Peoples introduced his friend "Sonny" (an unindicted co-conspirator in this case) to Spasaro. Sonny told Spasaro that he was aware that Spasaro was in Aruba to meet with some Colombians to discuss transporting a large amount of cocaine to Houston, and that Sonny would assist in coordinating the meeting. Spasaro also met Khalil Choucair, another friend of Peoples', who said he was a broker between Peoples and the Colombians. On February 6 and 7, Spasaro and Lyons met with Sonny, Choucair, Peoples, defendant de la Pava, and co-defendant Figueroa.[10] Spasaro told the other individuals that he understood that the deal called for him to buy 200 kilograms of cocaine at $6,500 per kilogram, that Peoples had arranged financing, and that the only remaining problem was getting an airplane from Houston to Colombia. De la Pava refused to sell any cocaine at less than $7,500 per kilogram, which was $1,000 more than the price Peoples had quoted to

Spasaro. The parties then settled on a price. De la Pava explained how he flew the cocaine paste from Bolivia to his laboratory in Colombia. By the end of February 7, the deal called for Spasaro initially to place twenty percent of the cost into a bank account held jointly by de la Pava and Peoples, and then two weeks after taking delivery deliver the remaining eighty percent in the form of cashier's checks payable to de la Pava. The parties tentatively planned for delivery to occur on March 24. Spasaro left Aruba on February 8.

Pickel called Spasaro on February 12 to check the status of the deal. Spasaro told Pickel that the parties were still negotiating and that he would let Pickel know when the cocaine was to arrive. Spasaro was in daily contact with Peoples and/or Toro during this time. Spasaro met with Peoples on February 19 to discuss the possibility of Spasaro flying to Panama to arrange a "money flash." Peoples also asked if Spasaro could transport some marijuana from Belize to Houston. During a taped telephone conversation later that day, Spasaro told Peoples that the price of the marijuana was negotiable to the extent that the pilot would receive $30,000 and the profit margin per pound had to be at least $5.00. Toro called Spasaro on February 22 to again discuss the possibility of the marijuana deal.

On February 26, Spasaro and Lyons flew to Panama City. They met with de la Pava and discussed financial arrangements. De la Pava left the meeting momentarily and returned with Carlos Alberto Mery-Cruz. Spasaro expressed interest in buying up to five hundred kilograms of cocaine every two weeks. Mery-Cruz said he could oblige but wanted an initial deal of only two hundred kilograms. The proposed deal called for Mery-Cruz's navigator to meet with Spasaro's pilot in Panama City, from which they would fly to Colombia and pick up two hundred kilograms of cocaine. Spasaro, with $1,500,000 in U.S. currency, would

---

**10.** Peoples testified that he knew Choucair and Figueroa from his prior dealings with them concerning platinum and emeralds. He stated that he did not know de la Pava prior to this meeting. He admitted that he arranged the Aruba meeting by contacting Choucair and informing him of Spasaro's interest in transacting a drug deal with Peoples' Colombian contacts. Peoples also stated, however, that he did not believe that Choucair was involved in narcotics.

remain in Panama City with Lyons, de la Pava, and Mery-Cruz. The four men would be in radio contact with Spasaro's airplane. After Spasaro's pilot indicated that he had picked up the cocaine, Spasaro would release the money.

Spasaro met with Peoples and Toro in Houston on March 3. The three men discussed Spasaro's recent trip to Panama City.

In Aruba, de la Pava had asked Spasaro about the possibility of Spasaro obtaining an aircraft exactly like one of de la Pava's drug-running airplanes that had crashed. If Spasaro could obtain an exact replica, then de la Pava would give him three kilograms of cocaine. On March 5, Spasaro called a number in Miami given to him by de la Pava to arrange to pick up the cocaine. Nelson Calvo, who answered the phone, agreed to meet with Spasaro in Miami on March 7. Calvo attempted to give Spasaro $3,000 on March 7, but Spasaro demanded three kilograms of cocaine. The two men then walked to a nearby pay phone, where Calvo talked with someone in Spanish. Spasaro heard Calvo mention "Mario." At the end of the phone call, Calvo admitted his mistake and delivered three kilograms of cocaine to Spasaro the next day.

Spasaro flew from Miami to Panama City on March 8. He was joined there by agents Lyons and Console. Spasaro and Lyons met with de la Pava and Mery-Cruz on March 10. Spasaro placed a call and Console arrived with a suitcase containing $1,500,000. The parties then discussed the pending drug deal, which called for Mery-Cruz's navigator to arrive on March 12 and pick-up to occur one day later. Console left with the money. At a meeting on March 11, Spasaro learned that because of local elections in Colombia, delivery would be postponed until March 15 or 16. On March 12, a wire transmitter began dangling from underneath Mery-Cruz's chair during a meeting of the parties. At one point, the transmitter actually hit his leg. When Mery-Cruz bent over to see what had

hit him, Spasaro leaped up, pushed on the chair, grabbed the transmitter, ripped off a piece of cardboard hanging under the chair and pretended that that was what had hit Mery-Cruz on the leg. Mery-Cruz and de la Pava immediately left the room but, when contacted later, agreed to meet the next morning. The parties met on March 13 and nothing was said about the dangling transmitter. Mery-Cruz and de la Pava returned to Colombia that day. On March 14, de la Pava called Spasaro and informed him that delivery might be postponed for a week.

On March 18, Spasaro called Toro from a pay phone in Fort Lauderdale. Toro was frantic because the Colombians had told Peoples that a transmitter had been found during a recent meeting. Peoples, in Colombia trying to keep the deal together, called Spasaro at the same pay phone a short time later. Spasaro told Peoples that there was no transmitter; Spasaro had merely hidden a gun under the chair in order to protect the large amount of money in the room. He had not told the Colombians that the object was a gun because the relationship of the parties was "built on trust." Spasaro could hear the voices of Mery-Cruz and de la Pava in the background. When de la Pava asked about his airplane, Spasaro said he was considering keeping it to cover all of his expenses.

Spasaro and agent Console met with Peoples in Houston on March 20. Peoples said the deal was still on despite the Colombians' concerns about the suspected transmitter. The Colombians wanted payment in the form of cashier's checks payable in Colombian pesos to Khalil Choucair. Peoples also said that de la Pava wanted his plane. Spasaro said he was keeping it until the deal went through. During a phone conversation the next day, Spasaro told Peoples that he could not obtain cashier's checks payable in pesos. Spasaro also said he wanted Peoples to be in Colombia when the deal went through and that he wanted de la Pava or Mery-Cruz to be with him in Panama.[11] Spasaro met with Peoples

11. Spasaro testified that he was concerned that the Colombians might hold his pilot and plane

hostage until Spasaro surrendered de la Pava's plane. Spasaro believed that being accompa-

again on March 24, at which time Peoples indicated that the Colombians had essentially agreed to Spasaro's terms.

Between March 20 and 24, Spasaro informed Pickel what had happened in Panama and that Peoples was trying to keep the deal going. Pickel said that he had several buyers ready and that he had given names to John Nattinger (an undercover DEA agent).[12] Spasaro said that Pickel's buyers "checked out okay." On March 24, Spasaro met in Houston with Pickel and defendant Brunk. Brunk said that he had known Pickel for a long time, that he had been in the business in the past, and that he knew several people who were interested in buying quantities of cocaine. The meeting adjourned with the understanding that Spasaro or Nattinger would contact Pickel from Panama when the deal transpired, Pickel would then contact Brunk, and Brunk could then call his buyers.[13]

Spasaro and agent Console flew to Panama City on March 30 and met with Peoples, Figueroa, de la Pava, and co-defendant Solis the next day. De la Pava got mad when Spasaro said that he was holding de la Pava's plane until after the deal transpired. Peoples wanted to know where the money was. Spasaro said that Lyons was bringing it and would arrive shortly. Lyons arrived thereafter with nine checks totalling $1,500,000 payable to "Khalil Choucair." De la Pava balked because the checks were payable in dollars instead of Colombian pesos. Spasaro said the agreement called for dollars. He then explained to de la Pava that he would not deal in pesos because if the deal was delayed, Spasaro would have to re-convert pesos to dollars and would lose money because of fluctuating exchange rates. De la Pava then said the deal was off unless he got pesos. Spasaro said he would have to talk to his superiors. Spasaro then left to call his boss, who refused to allow Spasaro to convert the checks into pesos. Spasaro then

decided to close the investigation but returned to the meeting and said he would deliver pesos the next day.

Spasaro called Nattinger on April 1 and told him that although the deal was off, Nattinger should inform the buyers that Spasaro was returning with the cocaine. On the same day and in the presence of Peoples and Solis, Spasaro called Pickel to let him know he would be arriving with the cocaine in a day or two and to stay in touch with Nattinger. Peoples then called Toro and told him to have his buyers ready. Spasaro then arranged to meet with Peoples and Solis later that afternoon after he had converted the cashier's checks into pesos. At the agreed-upon time and place, Panamanian authorities arrived and arrested Peoples, Solis, Figueroa and de la Pava. The Panamanian authorities released the four men into Spasaro's custody at Howard Air Force Base on April 2, and Spasaro then placed the men on a DEA plane bound for Houston, where arrest warrants issued on March 2, 1986, were formally executed.

Spasaro returned to Houston on April 2 and met with Pickel and Brunk. Spasaro told the two men that the cocaine was being unloaded and marked. Pickel said he had a number of individuals he wanted Spasaro to meet who had all been cleared by Nattinger. Brunk said he had his buyers ready and that he was meeting with someone later that evening. Pickel then arranged for an individual named Wilkinson to come to the hotel room. Wilkinson wanted a kilogram of cocaine as a sample to show his buyers, who otherwise would not give Wilkinson any money. Spasaro told Wilkinson that Nattinger would contact him about obtaining a sample later that evening. Brunk, who had stepped out of the room when Wilkinson entered, returned when Wilkinson left. Pickel and Brunk then named specific individuals as ready buyers. The three men agreed to meet the next morning.

---

nied by de la Pava or Mery-Cruz would minimize, or at least equalize, any potential hostage situation.

12. Nattinger also testified that he received names of buyers from Peoples.

13. Spasaro understood that he would sell to Pickel, Pickel would sell to Brunk, and Brunk would sell to his buyers.

During Spasaro's meeting with Pickel and Brunk, Toro called and asked where Peoples was. Spasaro suggested that Peoples had probably flown to Colombia with the Colombians. When Spasaro asked about Toro's buyers, Toro said he was meeting with them early the next morning.

Spasaro and Nattinger met with Pickel on April 3. One of Pickel's buyers, Young, arrived shortly thereafter. Young then left and returned with his buyer, Prowledge. Young and Prowledge left to meet a man with $200,000, and then Brunk arrived. Brunk said that his earlier-named buyer had already made a buy and would not need to buy any more cocaine for several days. He did have other ready buyers, however, and wanted to buy an eighth of a kilogram to take to his buyers as a sample. Spasaro refused to sell such a quantity and told Brunk to bring his buyers to the hotel where they could see a whole kilogram. After arguing for a while, Spasaro agreed to arrange for Nattinger to give Brunk a kilogram and Brunk agreed to pay for it within a few days. Pickel guaranteed payment. Brunk and Nattinger then left and drove to a nearby parking lot where DEA agents possessed a kilogram of cocaine obtained from a DEA lab in Dallas. An agent gave the cocaine to Nattinger, Nattinger gave it to Brunk, and Brunk locked it in his briefcase. Brunk was then arrested. Nattinger then returned to the hotel where he, Spasaro, and other agents arrested Pickel. Toro was arrested elsewhere in Houston that evening.

Following a joint jury trial of appellants and co-defendants Figueroa and Solis,[14] Peoples was convicted of conspiring to import cocaine, conspiring to possess cocaine with intent to distribute, travelling in interstate commerce to facilitate drug trafficking (three counts), and using a telephone to facilitate drug trafficking. Pickel was convicted of conspiring to import cocaine, conspiring to possess cocaine with intent to distribute, and using a telephone to facilitate drug trafficking (four counts). De la Pava was convicted of conspiring to import cocaine. Brunk was convicted of conspiring to possess cocaine with intent to distribute, and possession of cocaine with intent to distribute. Toro was convicted of using a telephone to facilitate drug trafficking.[15]

The five appellants raise numerous issues in challenging their convictions. We address their contentions, for the most part, individually.[16]

### PICKEL

#### A. *Entrapment*

Pickel argues that the government failed to prove predisposition and that its failure to do so left Pickel's entrapment defense undisputed and established as a matter of law.

▮▮▮ The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with government agents. *United States v. Nations*, 764 F.2d 1073, 1079 (5th Cir.1985). Two factors guide this determination: (1)

---

**14.** Figueroa and Solis were charged only with conspiracy to import cocaine and were acquitted. Mery-Cruz and Calvo are fugitives.

**15.** Relevant statutes include 18 U.S.C. § 1952; 21 U.S.C. §§ 841, 843(b), 846, 952(a), 960, and 963.

Peoples received two concurrent seven-year sentences to be followed by four concurrent five-year probation periods. He was also fined $300.00.

Pickel received two concurrent seven-year sentences to be followed by a five-year probation term. He was ordered to perform 500 hours of unpaid community service as a condition of probation. He was also fined $300.00.

De la Pava received a ten-year sentence and was fined $50.00.

Brunk received two concurrent ten-year sentences to be followed by a probation period of six years. He was fined $100.00.

Toro received a three-year probation period and was fined $50.00.

**16.** Peoples, Brunk, and Toro join in and adopt all issues raised by all other appellants pursuant to Fed.R.App.Pro. 28(i). The government is not prejudiced by this tactic as it has fully briefed all issues in response to appellants' various contentions. Our task on review is not necessarily facilitated, however, when appellants purport to adopt each others' contentions without sufficient accompanying argument to apply the desired legal principles to their individualized facts.

the existence of government inducement, and (2) the predisposition of the defendant, before contact with government agents, to commit the crime charged. *Id.* Procedurally, the defendant must present evidence that government conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it. Once the defendant has done so, then the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the charged crime. *United States v. Henry,* 749 F.2d 203, 207 n. 5 (5th Cir.1984) (en banc). Whether the defendant had the criminal intent required for conviction is a jury issue, as is whether the defendant was predisposed to commit the charged crime, i.e., whether, focusing on the period before the commencement of the charged criminal episode, one can say that the criminal intent or design originated with government agents. *Id.* at 213. To declare that the defendant was entrapped as a matter of law requires a conclusion that no reasonable jury could have believed that the defendant was predisposed to commit the offense. *United States v. Rubio,* 834 F.2d 442, 450 (5th Cir.1987).

Pickel, a real estate broker, testified that in December, 1984 while he was in a client's office building, he was approached by Carlos Quintero Villasenor. Villasenor said he was the only son of an immensely wealthy Mexican family interested in investing in American properties to avoid continued devaluation of the peso.[17] Pickel, understanding that he would receive a 6% commission on any deals, indicated that Villasenor should consider investing in Houston realty. The two men had additional discussions. During a meeting on January 8, 1985, Villasenor said he knew people with "zillions of dollars to invest." When Pickel expressed interest in meeting them, Villasenor made a phone call and agent Spasaro arrived shortly thereafter.

Spasaro discussed his multimillion dollar real estate holdings but, according to Pickel, most of the discussions thereafter concerned drug transactions. Pickel informed Spasaro that he knew nothing about drug deals but maintained a continuing relationship with Spasaro hoping that the two could transact some real estate deals. Although Spasaro kept promising to pay $100,000–$500,000 to Pickel if Pickel would only introduce Spasaro to potential drug investors, Pickel admitted that he soon became "blinded" by the possibility that he could make $12,000,000—$23,000,000 per year in commissions from profits generated by a cocaine factory.[18]

In considering whether Pickel was entrapped, the only relevant evidence was the testimony of Spasaro and Pickel. Not surprisingly, the men disagreed on what they knew about each other prior to their initial meeting, what was said at the first meeting, who first raised the possibility of importing cocaine, and who knew what about the drug business. At best, Pickel's defense of entrapment rested on resolution of factual issues. The government, in our opinion, introduced sufficient incriminating evidence of Pickel's early involvement to sustain its burden of proof that Pickel was predisposed to commit the charged crime. Because both Pickel and the government carried their evidentiary burdens, the district court properly submitted Pickel's entrapment defense to the jury, which rejected it, rather than resolving the entrapment issue as a matter of law.

Pickel also argues that the following portion of the jury charge on entrapment was improper:

> If, then, the jury should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, *either* defendant Peoples *or* defendant Pickel *or* both were ready and willing to commit the crime

---

17. Pickel testified that on January 15, after he had met Spasaro, Villasenor informed Pickel that his family had derived its wealth from a cocaine laboratory that the family now wanted to sell.

18. Pickel never received any money from Spasaro, and he testified during cross-examination that he knew as early as April 1985 that he would never receive any money from profits generated by a cocaine factory.

charged in the indictment, and that government officers or their agents did no more than offer the opportunity, then the jury should find that *either* one *or* both are not victims of entrapment. (emphasis added).

As he did not object to the court's instruction he must satisfy the heavy burden of demonstrating that it is plainly erroneous. He construes the instruction as requiring the jury to take an all-or-nothing approach and reject his entrapment defense even if it could only conclude that Peoples was not entrapped. We acknowledge that the language of the instruction is awkward. However, a fair reading of the instruction (especially the emphasized words), placed in context with the district court's admonition that "[e]ach count must be considered separately, and each defendant must be considered apart from the others[,]" does not support Pickel's strained construction of the language.

■ Pickel additionally alleges that access to and knowledge of the location of informant Villasenor was critical to his entrapment defense and that the district court therefore erred in overruling his motion requesting that the government disclose Villasenor's whereabouts. We have established a three-part test to determine whether governmental disclosure of informants is mandated. First, we evaluate the level of the informant's involvement in the alleged activity; the greater the participation, the more likely disclosure is required. Second, we consider the helpfulness of disclosure to the asserted defense. The defendant must establish that the informant's testimony would significantly aid him in asserting his defense. The third factor is the government's interest in nondisclosure. *United States v. De Los Santos,* 810 F.2d 1326, 1331 (5th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987).

■ Pickel fails on the first two factors. Villasenor's involvement was de minimus. The informant's only significant role herein was to introduce Pickel to Spasaro. Villasenor's only other participation was an alleged telephone call to Pickel one week

later. No one heard from Villasenor thereafter, and the government alleged that no conspiracy began until November 1985, almost ten months after Villasenor's last involvement. Therefore, any relevant testimony by Villasenor would have been extremely attenuated.

Furthermore, we seriously doubt that Villasenor's testimony would have *significantly* aided Pickel in asserting his entrapment defense. Pickel testified that if anything affected his predisposition—the focal point of inquiry in an entrapment defense—it was the multimillion dollar commissions that Spasaro indicated Pickel could reap from profits generated by a cocaine laboratory. Pickel does not contend that Villasenor exerted any coercive pressure on him. Nor did Villasenor ever attend any meetings between Pickel and Spasaro. We therefore fail to see how Villasenor's testimony would have significantly aided Pickel in asserting his entrapment defense.

### B. *Sufficiency of the Evidence*

Pickel argues that evidence is insufficient to support his convictions for conspiracy to import cocaine, conspiracy to possess cocaine with intent to distribute, and use of a telephone to facilitate drug trafficking. When a defendant challenges the sufficiency of the evidence, we must decide whether a rational jury could have found that evidence established guilt beyond a reasonable doubt. We will view the evidence in the light most favorable to the verdict, accepting all credibility choices made and reasonable inferences drawn by the jury. *United States v. Gardea Carrasco,* 830 F.2d 41, 43 (5th Cir.1987).

■ In order to prove the two conspiracy charges, the government had to establish beyond a reasonable doubt that (1) an agreement existed between at least two non-government people to import cocaine and to possess cocaine with intent to distribute, and that (2) the charged individuals (a) knew of the conspiracy, (b) intended to participate in the conspiracy, and (c) did participate in the conspiracy. *Id.* at 44.

■ The evidence is more than sufficient to establish Pickel's guilt on the conspiracy charges. Pickel introduced Peoples to Spasaro, knowing that both men wanted to put a drug deal together. He coordinated and attended meetings between the two men during which drug importation was discussed. He knew of the foreign trips. He was aware that Spasaro heavily depended on him to provide U.S. buyers. Pickel actually furnished several potential buyers' names to Nattinger. Pickel admitted reserving the hotel room in April 1986 for the known purpose of arranging drug distribution. He introduced Wilkinson and Brunk to Spasaro, remained in the room during discussions, and even guaranteed Brunk's payment. According to Spasaro, Spasaro was to sell to Pickel, who would then sell to Pickel's buyers, rather than Spasaro selling directly to Pickel's buyers. Clearly, Pickel was the most important "downstream" member of the conspiracy, and the evidence proving that Pickel conspired to import and to possess with intent to distribute was more than sufficient to sustain the convictions.

To prove a violation of 21 U.S.C. § 843(b), the government had to establish that Pickel knowingly and intentionally used a communications facility, e.g., a telephone, to facilitate—to make easier or less difficult, or to assist or aid—a narcotics offense. *United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir.1981), *cert. denied sub nom.*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1981). The telephone counts upon which Pickel was convicted involved taped conversations made on November 26, 1985; December 6, 1985; December 9, 1985; and March 19, 1986.[19]

■ During the first call, Pickel asked Spasaro if Spasaro could import five tons of marijuana from Colombia. Spasaro expressed interest and the two men discussed the possibility of meeting the seller. On December 6, 1985, Spasaro and Pickel discussed when and where they would meet with Peoples to continue discussions concerning the Colombian marijuana shipment. Three days later, Pickel informed Spasaro

that Peoples had the Colombian drugs but did not have the money to transport it or a market for it. Pickel said that Peoples would be going to Colombia later that week, and the two men arranged to meet with Peoples prior to his departure. During the fourth call, Pickel furnished the name of Gilberto Ridero as a potential buyer. The evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that on these four occasions Pickel knowingly and intentionally used a telephone to facilitate a narcotics offense.

### C. Out-of-court Statements

Pickel contends that the district court erred in overruling defense objections to the government eliciting testimony from its agents regarding out-of-court statements by unproduced and unindicted co-conspirators. He contends that the government was required to produce the co-conspirators for cross-examination or provide a reasonable explanation for their unavailability. The Supreme Court has rejected this argument. *See United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

### PEOPLES

### A. Delay in Executing Arrest Warrants

Peoples argues that the trial court should have suppressed all evidence obtained by the government during the three-week interval between issuance (March 11, 1986) and execution (April 2 or 3, 1986) of the arrest warrants. He contends that the government's delay in executing the arrest warrants violates his constitutional rights, including due process, right to counsel, and privilege against self-incrimination. He also alleges that the delay violates Rules 4(c)(1) and 5(a), Fed.R.Crim.Pro.

■ We reject this argument for numerous reasons. First, law enforcement officials are under no constitutional duty to terminate a criminal investigation the moment they have an arrest warrant in their hands. This is so because evidence suffi-

---

19. Pickel was acquitted on one count of violating 21 U.S.C. § 843(b).

cient to sustain issuance of an arrest warrant, i.e., probable cause, may not be sufficient to sustain a conviction. *United States v. Cravero*, 545 F.2d 406, 413 (5th Cir.1976), *cert. denied sub nom.*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977); *United States v. Hudgens*, 798 F.2d 1234, 1238 (9th Cir.1986). Second, we are unaware of any caselaw suggesting that a defendant's constitutional rights attach at the moment an arrest warrant is issued. Third, Rules 4(c)(1) and 5(a) command that an *arrested* defendant be promptly brought before the nearest available magistrate. A defendant is arrested upon execution, not issuance, of the warrant, however. And finally, a three-week delay between issuance and arrest is not *per se* unreasonable and the record does not reveal that the government acted unreasonably during the period or that its reasons for delaying execution were improper.

## B. *Sufficiency of the Evidence*

Peoples alleges that the evidence is insufficient to sustain his convictions for conspiracy to import, conspiracy to possess with intent to distribute, and travelling in interstate commerce to facilitate drug trafficking. He specifically argues that he never agreed with anyone to commit an illegal act, that he lacked the requisite intent, and that no consummated agreement existed between the parties.

■ The jury heard testimony that Peoples introduced Spasaro to his Colombian friends and that Peoples attended meetings in Houston, Miami, Aruba, Colombia, and Panama with people other than just Spasaro during which the major topic was importing cocaine. Agent Nattinger testified that Peoples had provided him with names of potential distributors. Evidence also suggested that after the "dangling transmitter" fiasco, Peoples' negotiations with the Colombians kept the narcotics deal alive. The deal was for all practical purposes consummated when Spasaro promised to make the cashiers' checks payable in pesos. The government presented sufficient evidence to permit a rational trier of fact to conclude beyond a reasonable doubt

that Peoples was guilty of the charged crimes.

## C. *Entrapment*

Peoples next challenges the jury's rejection of his entrapment defense. He argues that he was the victim of "devious government agents who manufactured a criminal design and solicited, enticed, lured, persuaded, and otherwise implanted" in his mind "the disposition to seriously contemplate the commission of the charged offenses[.]" The evidence suggests otherwise.

Peoples testified that he was a money broker and precious metals dealer who had legal ongoing business ventures in Colombia. In late 1985, Peoples was trying to transport five tons of platinum out of Colombia but did not have the funds or transportation to do so. Pickel said that he had a friend who might help and introduced Peoples to Spasaro on December 4, 1985. Although the two men discussed the platinum deal, Spasaro seemed more interested in knowing whether Peoples had narcotics contacts in Colombia. During a telephone conversation with Pickel the next day, Peoples expressed doubts about doing business with Spasaro but told Pickel not to terminate discussions if the possibility existed that Spasaro could transport the platinum. Peoples met with Spasaro and Pickel on December 6, 1985, during which numerous matters were discussed, including Peoples' platinum deal. The focus of meetings and telephone conversations thereafter, however, was on narcotics transactions. Peoples testified that he never expected to receive anything from the drug deals. He also admitted that Spasaro never made his participation in Peoples' platinum deal contingent on Peoples introducing him to his Colombian friends.

■ The trial court submitted Peoples' entrapment defense to the jury. Nothing in the evidence suggest that the jury erred in rejecting the defense. Again, as with Pickel, the jury heard conflicting testimony from two men, Spasaro and Peoples, as to what was discussed during the initial meeting and who knew what about trafficking

in narcotics. A rational jury could have resolved the conflict by concluding beyond a reasonable doubt that Peoples was not entrapped.

### D. *Outrageous Conduct*

Peoples contends that governmental conduct herein was so outrageous as to violate due process. He believes that the government acted outrageously by (1) engineering and directing the criminal enterprise throughout, (2) kidnapping him from Panama and transporting him in shackles to Houston, and (3) failing to suppress evidence obtained after arrest warrants were issued.

 Relying on Supreme Court precedent, we have recognized that a defense based on government misconduct exists in appropriate cases. *United States v. Miller*, 799 F.2d 985, 988 (5th Cir.1986). A common thread in our decisions wherein outrageous government conduct or overreaching is raised is the observation that an active participant in the criminal activities prompting arrest cannot avail himself of the defense. *Id.* Having already concluded that Peoples was actively and willingly involved herein, we also conclude that Peoples cannot assert the defense of outrageous conduct.

### DE LA PAVA

### A. *Jurisdiction*

 De la Pava asserts that the trial court did not have proper jurisdiction over him because the DEA removed him from Panama without complying with extradition procedures found in a Panama-United States treaty ratified in 1904. The well-established law of this circuit holds that "a defendant in a federal criminal trial whether citizen or alien, whether arrested within or beyond the territory of the United States may not successfully challenge the District Court's jurisdiction over his person on the grounds that his presence before the Court was unlawfully secured." *United States v. Winter*, 509 F.2d 975, 985–86 (5th Cir.), *cert. denied sub nom.*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *see also*

*United States v. Rosenthal*, 793 F.2d 1214, 1231–32 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). We see no reason to depart from that law here, where de la Pava is neither American nor Panamanian, and neither party to the treaty has objected to de la Pava's extradition. See *United States v. Reed*, 639 F.2d 896, 902 (2d Cir.1981).

### B. *Sufficiency of the Evidence*

De la Pava next argues that there was insufficient evidence to convict him of conspiring to import cocaine in violation of 21 U.S.C. §§ 960, 963. He raises four points of contention. First, the Government cannot rely on 21 U.S.C. §§ 960 and 963 to convict him for solely extraterritorial conduct. Second, if de la Pava conspired with anyone, it was only with Spasaro. Third, evidence of de la Pava's ability and intent to import cocaine is non-existent. And fourth, a conspiracy never existed because the parties never reached a final agreement.

 The government need not prove any overt act in order to obtain a conviction for conspiracy to import cocaine; rather, the government need only prove that de la Pava intended that his extraterritorial activities affect U.S. territory in order to successfully invoke 21 U.S.C. §§ 960, 963. *United States v. Loalza–Vasquez*, 735 F.2d 153, 156 (5th Cir.1984).

 The jury heard evidence that de la Pava attended several meetings during which a major topic of discussion was how Spasaro was going to get de la Pava's cocaine to Houston. Spasaro also testified that at least after the "dangling transmitter" incident, Peoples—not Spasaro—was the glue that held the deal together and that on at least one occasion (March 18, 1986), de la Pava met with Peoples in Spasaro's absence. Also, de la Pava, as the primary representative of the Colombian source, was constantly meeting with other Colombians, including Mery-Cruz, Figueroa, and Solis, and representing their interests as well as his own. As to de la Pava's ability to import a large amount of cocaine, Spasaro testified that de la Pava had dis-

cussed his cocaine laboratory in Colombia. The jury also heard evidence suggesting that the only stumbling block remaining on March 30, 1986, was whether Spasaro would pay in dollars or Colombian pesos. Spasaro agreed to pay in Colombian pesos.

From the above, we conclude that the government presented evidence sufficient to permit rational jurors to conclude beyond a reasonable doubt that de la Pava intended for his extraterritorial activities to affect U.S. territory, that de la Pava did not conspire only with Spasaro, that de la Pava had the ability and intent to import large amounts of cocaine, and that de la Pava and other parties had consummated the major terms of the deal prior to arrest.

### C. *Multiple Conspiracy Jury Instruction*

De la Pava alleges [20] that the trial court committed reversible error by not granting his request for a jury instruction on multiple conspiracies. His argument is unclear. On one hand, he and Peoples (who adopted this argument) seem to rely on evidence suggesting that a third conspiracy, separate and distinct from the two conspiracies charged in the indictment, existed. This alleged third conspiracy was reflected in negotiations among Spasaro, de la Pava, and Calvo to exchange an airplane for three kilograms of cocaine. On the other hand, de la Pava suggests that because the evidence revealed multiple conspiracies at work—including the importation conspiracy, "Miami transaction, Brunk transac-

tion, Wilkinson transaction, Lester Young transaction, Prowledge transaction and ... money laundering schemes with Peoples"— he was prejudiced by being tried under circumstances which allowed the jury to speculate as to the conspiracies in which de la Pava belonged.

■ Multiple conspiracy jury instructions inform the jury that it must acquit the defendant if it concludes that he was not a member of a conspiracy charged against him, even if it finds that the defendant was a member of an uncharged conspiracy. Whether evidence establishes the existence of an additional conspiracy separate and distinct from that charged in the indictment is a jury issue. *United States v. Erwin*, 793 F.2d 656, 662 (5th Cir.1986). A defendant is entitled to a multiple conspiracy instruction if he specifically and timely requests such an instruction and his theory has legal and evidentiary support.[21] The court may decide as a matter of law that the evidence fails to raise a factual question for the jury. *Id.* It follows also that the court may conclude that the legal basis for a multiple conspiracy claim is absent.

In *Erwin*, numerous defendants were charged with participating in a single conspiracy to acquire, possess, and distribute narcotics. The trial court refused to grant the defendants' requested multiple conspiracy instructions. The appellate court concluded that there existed evidence of two

---

**20.** Pickel's brief identified as a point of error the court's failure to instruct on multiple conspiracies. Because he neither discussed this point in his brief nor adopted de la Pava's argument, we deem the point waived. Fed.R.App.Pro. 28(a)(4); Fifth Cir. Loc.R. 28.2.2.

**21.** In *Erwin*, the defendant submitted the following proposed jury instruction taken from *Pattern Jury Instructions* (West 1984):

You are further instructed, with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find

that no such conspiracy existed, then you must acquit the Defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular Defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that Defendant. In other words, to find a Defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

As in *Erwin*, we do not suggest that the court is limited to this instruction but only that this or a similar instruction be given when the court gives multiple conspiracy instructions. 793 F.2d at 661 n. 6.

"independent" conspiracies with "virtually no interchange of personnel or other evidence that co-conspirators worked for both." *Id.* at 663. The court also concluded that there was a factual issue as to whether two separate and distinct distribution conspiracies existed, noting that "uncontested testimony indicated that the pill and cocaine distribution networks were completely different." *Id.* Because evidence of multiple conspiracies existed, the appellate court held that the trial court committed reversible error by refusing to give multiple conspiracy instructions.

■ Unlike the situation presented in *Erwin*, de la Pava's multiple conspiracy theories satisfy neither the factual nor legal predicate for submission of a jury issue. The "plane-for-cocaine" conspiracy, which involved de la Pava, Calvo, and Spasaro, might have furnished the factual basis for a multiple conspiracy issue if there was any serious doubt about the existence of de la Pava's participation in the importation conspiracy charged against him. In *Erwin*, for example, codefendant Don Erwin contended, and our court found supporting evidence, that whereas the indictment charged one, broad multimember conspiracy to acquire, possess and distribute narcotics, Don Erwin may not have participated in that conspiracy, but may have operated his own, separate conspiracy. De la Pava, however, was an intimate participant in both the plane-for-cocaine and cocaine import transactions, and the former may properly be characterized as a stepping-stone on the road to accomplishing the indicted importation conspiracy. On the evidence before the trial court, recited above in detail, there is no threat that de la Pava was erroneously convicted of conspiracy to import *because* the jury found he had participated only in a plane-for-cocaine conspiracy. The court's charge, moreover, informed the jury of their responsibility to convict the defendant only for the indicted conspiracy offense and thus additionally offset any disproportionate impact of evidence of the plane-for-cocaine deal.

■ De la Pava (joined by Peoples) alternatively contends that he was convicted of an importation conspiracy because distribution conspiracies prejudiced the jury's consideration of his defense. This contention fails to meet the basic legal assumption behind the multiple conspiracy defense: that one broad conspiracy was charged even though the defendant was involved, at most, in a similar or different conspiracy. *See Erwin, supra.* Neither Peoples nor de la Pava was charged in a conspiracy in which they were not the prime movers. That the government chose to try them along with defendants charged with another conspiracy is a matter of joinder, not an affirmative defense. There is little, if any, likelihood that the jury convicted de la Pava of conspiracy to import based on transactions involving Brunk, Wilkinson, Young, or Prowledge, distribution activities in which de la Pava did not participate in any way. Nor can Peoples claim that the evidence raises a multiple distribution conspiracy defense.

## BRUNK

### A. *Sufficiency of the Evidence*

Brunk challenges his conviction for possession of cocaine with intent to distribute on the ground that the government failed to prove possession—either actual or constructive. His argument rests on the facts that (1) the DEA maintained dominion over the cocaine up until the time of delivery and (2) the presence of numerous DEA agents at the arrest site precluded the possibility that he would ever leave the parking lot or do anything with the cocaine prior to being arrested.

■ Brunk conveniently overlooks the fact that he took actual delivery of the cocaine from agent Nattinger and locked it in his briefcase.[22] Although the resulting arrest immediately thereafter terminated Brunk's brief dominion over the cocaine, that does not mean that dominion sufficient

---

**22.** This fact alone renders misplaced Brunk's reliance on *United States v. Moreno-Hinojosa,* 804 F.2d 845, 847 (5th Cir.1986) ("[T]here was

no evidence to connect Moreno's person to the marijuana.").

to justify conviction in a reasonable juror's mind never existed. To hold otherwise would require us to define "possession" in a manner that affords Brunk an opportunity to escape with the contraband. That we decline to do. Such a definition would defy common sense, place an impossible burden on police, and contribute to the very evil that the violated statute intended to eliminate. *United States v. Martorano*, 709 F.2d 863, 871 (3rd Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *see also United States v. Perry*, 747 F.2d 1165 (7th Cir.1984).

### B. *Joinder and Severance*

Brunk alleges that the trial court abused its discretion by denying his motion for severance. He, as well as Pickel and Peoples, argue that each party suffered compelling prejudice therefrom.

■ As a general rule, defendants indicted together should be tried together. *United States v. Lee*, 744 F.2d 1124, 1126 (5th Cir.1984). Rule 8(b), Fed.R.Crim.Pro., provides:

> *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

We have held that separate conspiracies with different memberships may be joined if they are part of the same series of acts or transactions. *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir.1985). ■ Here we find two drug conspiracies: a conspiracy to import, and a conspiracy to possess with intent to distribute. It is irrelevant that de la Pava was not charged with conspiracy to possess with intent to distribute, that Brunk was not charged with conspiracy to import, and that Brunk was the only individual charged with possession with intent to distribute. All joined defendants need not be uniformly charged. See *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir.1981); Fed.R. Crim.Pro. 8(b) (last sentence). What is important is that the "downstreamers," including Pickel and Brunk, knew that Spasaro was importing cocaine which they would buy and distribute. The "upstreamers," including Peoples and de la Pava, knew that Spasaro was going to distribute cocaine which he was importing. Also significant is our conclusion that evidence was sufficient to convict both Peoples and Pickel on both conspiracy charges. Examined broadly, the record presents two conspiracies substantially interrelated by their facts and participants, rather than two separate and distinct conspiracies. Therefore Rule 8(b) authorized joinder of these defendants.

Brunk objected to joinder and filed a motion for severance pursuant to Rule 14, Fed.R.Crim.Pro., which provides in pertinent part:

> If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The district court denied Brunk's motion. We review the denial of a Rule 14 motion under an abuse of discretion standard. *Harrelson*, 754 F.2d at 1177. To prove that the district court abused its discretion, "the appellant must show that he suffered specific and compelling prejudice against which the trial court was unable to afford protection, and that this prejudice resulted in an unfair trial." *Id.*

■ Brunk alleges that he suffered compelling prejudice because his plea of not guilty and Pickel's defense of entrapment were antagonistic. To justify severance, however, the defenses must be more than merely antagonistic; they must be irreconcilable and mutually exclusive. *United States v. Holcomb*, 797 F.2d 1320, 1324 (5th Cir.1986). As applied herein, we must find that if the jury could believe that Pickel was entrapped, then it could not believe that Brunk was not guilty. Brunk

admits that the two defenses are not mutually exclusive *per se*. See *United States v. Lentz*, 624 F.2d 1280, 1290 (5th Cir.1980), *cert. denied*, 450 U.S. 995, 101 S.Ct. 1696, 68 L.Ed.2d 194 (1981). Brunk contends, however, that the government's cross-examination of Pickel, during which it violated a motion in limine and extracted information of Brunk's prior conviction for possession of cocaine with intent to distribute, rendered the defenses mutually exclusive in this case. We fail to comprehend how the jury's exposure to Brunk's prior cocaine dealings would force the jury to convict Brunk if it concluded that Pickel was entrapped. Furthermore, any finding of compelling prejudice resulting therefrom was mitigated by the fact that the trial judge sustained counsel's objections to the government's line of questioning, instructed the jury to disregard what they had heard, and at the close of trial reiterated to the jury that it "must not consider any evidence to which an objection has been sustained or which I have instructed you to disregard."

Pickel and Peoples argue that Brunk's involvement was limited to an isolated buyer-seller transaction with DEA agents and that Brunk was not part of a conspiracy to possess with intent to distribute. Pickel and Peoples contend that they were therefore prejudiced by the trial court's denial of Brunk's severance motion because the jury convicted them under a "guilty by association" theory. We reject this argument for two reasons. First, the jury heard sufficient evidence from which it could conclude that Brunk was a member of the conspiracy to possess with intent to distribute. Pickel had informed Brunk of the cocaine deal as early as February 1986, Brunk expressed interest in meeting Spasaro as a distributor, and Brunk and Pickel both met with Spasaro at least twice during which distribution was a major topic discussed. Second, even ignoring all of the evidence of Brunk's involvement, evidence sufficient to sustain the convictions of Pickel and Peoples still exists. Pickel and Peoples will have to do more than sever themselves from Brunk before they can sever themselves from guilty verdicts.

## TORO

### A. *Inconsistent Verdicts*

Toro was acquitted on charges of conspiracy to import cocaine and conspiring to possess cocaine with intent to distribute. He therefore argues that his conviction for using a telephone to facilitate drug trafficking must be vacated because of the inconsistent nature of the three verdicts. This argument on similar facts was unanimously rejected in *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), and for reasons articulated therein, we reject Toro's claim.

### B. *Sufficiency of the Evidence*

Toro also alleges that evidence was insufficient to sustain his conviction for using a telephone to facilitate drug trafficking, a violation of 21 U.S.C. § 843(b).[23] The basis for Toro's offense was a taped telephone conversation he had with agent Nattinger on March 17, 1986, during which Toro said that he had talked with Peoples in Colombia, that "everything is okay, they're ready to move tomorrow[,]" that Peoples would call Toro later that evening, and that Nattinger should contact Spasaro. The physical and testimonial evidence concerning this conversation was sufficient to permit the jury to conclude beyond a reasonable doubt that Toro knowingly and intentionally used a telephone to facilitate a narcotics offense.

## CONCLUSION

Finding no merit in any of the appellants' arguments as applied to themselves or to each other, we AFFIRM their convictions.

---

**23.** Toro was acquitted on one count of violating 21 U.S.C. § 843(b).