**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Martin David JOHNSON,**
**Defendant–Appellant.**

No. 88–2330.

United States Court of Appeals,
Fifth Circuit.

April 28, 1989.

Gus A. Saper, Michael J. Hinton, Patrice M. Barron, Houston, Tex., for defendant-appellant.

Mervyn Hamburg, Atty., Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C., Paula C. Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before RUBIN, POLITZ, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Appellant Martin David Johnson, along with Cleo Scott and James Smith, was charged by federal grand jury of seven counts of federal firearm violations pursuant to 18 U.S.C. § 371 and 26 U.S.C. § 5861. Additionally, Johnson was charged with solicitation to commit an act of violence in violation of 18 U.S.C. § 373. Johnson was acquitted of all counts except for the solicitation count. He was sentenced to five years' imprisonment. He appeals from that conviction.

## I. BACKGROUND

The scenario which unfolded at trial began approximately one year before Johnson became involved with the events forming the basis for this prosecution.[1] The principal players in this drama include paid undercover informant Thomas Benton Delashaw, III, who worked undercover using the name John Michael Bennett.[2] Delashaw/Bennett posed as a pilot for another key figure, FBI agent Jerry Howe, who posed as entrepreneur Jerry Gaffney. Co-indictee James Smith was an employee of Allied Offshore Marine, an establishment co-owned by appellant Johnson, a former police officer. Of these, only Johnson and Delashaw/Bennett testified at trial. However, numerous tape recorded conversations involving the other players were introduced into evidence.

Our story begins in February of 1986, when Delashaw, going by the Bennett alias, met Smith while both were incarcerated in the Harris County jail. The two men were in daily contact during their tenure in prison and they often exchanged "war stories." In the course of these discussions, Smith told Delashaw/Bennett (hereinafter Delashaw) that Smith could furnish illegal weapons upon request, and that he had a significant amount of experience with automatic weapons, rockets, and grenades. Delashaw informed the FBI of Smith's boasting in exchange for remuneration.

After his release, Delashaw worked as an informant for several federal agencies. Specifically, Delashaw told Smith (who had also been released) that he was employed as a pilot for a wealthy individual who operated a timber company in Arkansas, but who was also a drug dealer on the side. The timber operator was identified as Jerry Gaffney, the undercover identity of FBI agent Howe (hereinafter Howe).

On November 8, Smith had a phone conversation with Delashaw in which Smith discussed his access to various weapons. Over the next several months, Smith and Delashaw had over 200 conversations, the majority of which were recorded by Delashaw with equipment supplied by the FBI. In the first recorded conversation, which occurred on November 18, 1986, Smith offered to sell weapons to Delashaw's employer. For the remainder of the year, the men spoke frequently about the prospect of Smith selling various kinds of weapons, including weapons which were semi-automatic when manufactured, but which could be converted to fully automatic by Smith's associate, co-indictee Scott.

During this period, Delashaw remained in the Houston area, but Smith moved to Florida. In January of 1987, Smith told Delashaw that he had been offered a job in Morgan City, Louisiana, as a boat engineer at Allied Marine Offshore (hereinafter Allied). Johnson co-owned Allied and resided in Louisiana. Prior to Smith's relocation to Louisiana, he met with Delashaw and Howe in a motel room in St. Augustine, Florida, where Howe purchased an Uzi automatic machine gun.

In February of 1987, Smith commenced working for Allied as an engine repairman.

---

**1.** These facts are derived from the testimony and other evidence presented at trial. Statements made prior to February 17 were admitted as background only, and the jury was so instructed.

**2.** Delashaw had worked undercover prior to becoming involved in the situation involved in the instant case. He was given the name John Bennett as part of the witness protection program.

Smith maintained contact with Delashaw and continued his attempts to obtain weapons for resale to Howe. Delashaw informed Smith that Howe had sold the timber company and had purchased an offshore marine business headquartered in Houston. On February 17, 1987, Smith told Delashaw that he, Smith, had been retained "to perform a contract" to harm someone in the Houston area. The following day, in another telephone conversation, Smith indicated that the person who had hired him was attempting to locate the apartment in which the victim resided.

Further, Delashaw told Smith that Howe was interested in acquiring a boat; Smith thereupon accepted an invitation to fly to Houston to discuss the matter. On February 23, Smith, Howe, and Delashaw met in a Houston motel room. The men discussed the sale of machine guns, and Smith indicated that Johnson had already bought machine guns and wanted automatic weapons. Significantly, Smith identified Johnson as the person who had hired him to harm someone in Houston. Smith indicated that he had not yet committed to performing the deed, and added that Johnson had not yet provided all the necessary information about the victim. Delashaw attempted to dissuade Smith from performing the contract, pointing out that Smith could avoid trouble if he allowed Howe's people to do the job.[3]

Smith and Delashaw continued to discuss their gun deal. On March 4, Smith mentioned that Johnson had not yet disclosed the name of the intended victim. One week later, Delashaw repeated his offer to let Howe's men take care of the matter, but Smith indicated that he needed the money that Johnson had agreed to pay. Delashaw further testified that, in a conversation which took place on March 11, Smith told him that Johnson had enlisted the services of Smith to act as a body guard, armed with an automatic weapon, for a meeting which was to occur at sea.

On March 21, Smith informed Delashaw that the delivery of the machine guns would be postponed. Seven days later in a

taped conversation, Johnson telephoned Howe to say that the mechanical operation necessary to prepare the weapons for delivery had not yet been performed. In the meantime, Johnson invited Howe and Delashaw to visit him in Morgan City, Louisiana, to look at boats. Delashaw and Howe arrived on March 31. While Johnson was giving the men a tour of Allied, they encountered Smith, who apologized for the delay in delivering the guns and explained that certain parts were still unavailable.

Johnson, testifying on his own behalf at the trial, disclaimed any knowledge that semi-automatic weapons were being illegally converted to automatic. Johnson indicated that Smith had suggested that Gaffney (Howe) was eager to make a gift of semi-automatic machine guns to his cousin. Because semi-automatic weapons could be legally purchased, Johnson decided to purchase the weapons and present them to Howe if Howe purchased a boat. Johnson testified that he did not realize that the "kits" the other men referred to were conversion kits; rather, he assumed that the machine guns had to be assembled. Johnson also testified that he began to believe that Howe was involved in organized crime, during this visit to Morgan City; he stated that he contacted Louisiana law enforcement officials to report the possibility that Howe was bringing drugs into the area. Johnson testified that his cooperation in the delivery of guns to Howe was prompted by fear for his safety and the safety of his family.

During the month of April, Smith and Delashaw were in frequent contact by telephone. The primary topic of their conversations was the machine guns which had still not yet been readied for delivery. In one conversation, Smith indicated that Johnson had left town suddenly; the men expressed concern that Johnson would attempt to undermine the gun deal by bargaining on his own. Smith informed Delashaw that they were insured against that possibility because Smith knew where Johnson's family resided and was aware of thousands of dollars worth of engines and

**3.** This conversation was recorded. Government Exhibit 28 (audio tape).

other equipment that Johnson had stolen. Smith indicated that, if Johnson caused any problems, Johnson's family would be buried with legal problems. Delashaw encouraged Smith to itemize the stolen property so that the list could be used for insurance against double dealing.

Telephone conversations between Delashaw and Smith concerning the gun deal continued into May; occasionally they discussed the plan to harm the still unnamed victim. On May 12, Smith stated that he could not recall the victim's name, but knew that he was a firearms dealer in Houston. On May 14, Smith told Delashaw that he doubted that Johnson had sufficient funds to pay for the planned assault.

Ultimately, on June 3, Smith informed Delashaw that Johnson had identified the victim as Victor Mullen, a firearms dealer in Houston. Smith stated that Johnson had indicated that Mullen "dealt guns" and had once "informed on" Johnson. Delashaw encouraged Smith to let Howe's people take care of the matter. According to the testimony at trial, Delashaw and Howe had devised a plan to prevent the assault from actually taking place. Delashaw informed Smith that an associate named Joey, who was particularly adept with a baseball bat,[4] could perform the deed. Smith warned Delashaw to use a team of men because it was believed that Mullen's apartment was full of guns. Smith indicated that Johnson wanted Mullen to receive a broken leg.

In early June, Johnson met in Houston with Howe, Delashaw, and an agent posing as Howe's cousin. At the meeting, much of which was recorded on videotape, Johnson told stories about Smith's use of explosives. Specifically, he referred to two incidents: in the first, Johnson told how Smith had destroyed the backyard of someone who Smith suspected was having an affair with his wife; in the second, Johnson told the group how Smith had blown up a car belonging to a man who owed money to Johnson. Significantly, Johnson discussed the Victor Mullen matter with Delashaw and Howe and stated that Mullen had cheated one of Johnson's friends in a gun transaction. He described the intended victim (Mullen) and indicated that he wanted his "ass kicked good." According to the testimony introduced by the Government, Johnson suggested that Mullen's Rolex and guns be stolen; Johnson asked for the Rolex.[5]

Telephone conversations between Delashaw and Smith continued into mid June with the primary focus on the pending gun transaction. However, the plan to harm Mullen was occasionally referred to. In one instance, Smith requested that the watch in which Johnson had expressed interest be withheld until payment for the assault was received. Additionally, Smith told Delashaw that if it was discovered that Johnson worked for the police, he would harm or even kill Johnson.[6]

---

**4.** Delashaw stated that he had referred to Joey's skill with a baseball bat because Smith had made a previous reference to wanting to do a "bat job" on the victim.

**5.** Johnson, testifying as to the origin of the Mullen scheme, indicated that Victor Mullen was previously engaged to Tammy Robson, Johnson's girlfriend in Houston. Robson told Johnson that Mullen had beat and threatened her. Johnson asked Smith to approach Mullen with the request that he quit harassing Robson. According to Johnson, Smith suggested that there were people in Houston who could do more than just scare Mullen. Johnson told him to forget about it, but Smith initiated the plan to hire Joey against Johnson's wishes. Johnson asserted that, because the hiring of the assailant seemed to be inevitable, he tried to stall for time by withholding information as to Mullen's whereabouts.

**6.** Smith made numerous threats to Johnson encompassing violence and kidnapping of Johnson's child. Johnson argues that the threats were encouraged by the Government. Johnson points to Delashaw's assurance that Smith would be given an opportunity to leave the country if it became necessary to harm Johnson. Also, Johnson argues that it was Howe who suggested that a list of items stolen by Johnson be compiled and held as "insurance." Delashaw testified that Howe did encourage Smith to compile such a list because the FBI was interested in the information.

Johnson testified that Smith was following him and had threatened his family. He stated that concern for his well-being prompted his cooperation in the Mullen matter.

On June 25, Delashaw spoke with Johnson. The men discussed drug trafficking and money laundering schemes. In the context of the plan to harm Mullen, Delashaw asked if Johnson had a photograph of the victim. Johnson said he would provide one.[7] In a videotaped conversation, Johnson gave Howe a photograph of Mullen and stated that he had arranged for a police officer to break into Mullen's apartment and steal the picture. Howe suggested that if Joey had a key, he could surprise Mullen in the apartment. Howe, visualizing the events to transpire, said "Guess who's here for dinner." Johnson suggested that Mullen would be sitting at a table when Joey would enter and ask "Do you know anything about baseball?". Johnson then hummed a portion of the theme from "Batman." Subsequent to this conversation, law enforcement officers learned that Mullen had previously been engaged to Johnson's girlfriend, Tammy Robson. Johnson was later told that Joey had taken care of Mullen. Johnson was then arrested.[8]

Johnson, along with Scott and Smith, was charged with seven counts of federal firearm violations. Johnson was also charged with one count of solicitation to commit a crime of violence. Specifically, Count Eight charged

> [t]hat from on or about May 6, 1987 through on or about July 10, 1987, ... MARTIN DAVID JOHNSON ... with intent, did solicit, induce and otherwise

endeavor to persuade Jerry W. Howe, Special Agent of the Federal Bureau of Investigation and Tom Delashaw to engage in conduct constituting a felony that has as an element the use, attempted use or threatened use of physical force against the person and property of another in violation of the laws of the United States; that is, MARTIN DAVID JOHNSON, ... with intent, did solicit induce and otherwise endeavor to persuade Jerry W. Howe and Tom Delashaw to unlawfully take and obtain firearms from Victor James Mullen, Jr., a federally licensed firearms dealer, against his will by threats or violence, thereby interfering with commerce, to wit: robbery as proscribed by Title 18, United States Code, Section 1951.

The jury acquitted Johnson of the first seven counts, but found him guilty of the solicitation count.

## II. DISCUSSION

Johnson raises a plethora of grounds on appeal citing to alleged error occurring at all phases of the adversary process. We have carefully examined each ground asserted by Johnson, and find no reversible error.

### A. *Brady Motion*

Prior to trial, defense counsel received an anonymous letter stating that Agent Howe had been the subject of many internal inquiries concerning his abuse of authority

---

7. Johnson later testified that he found the photograph in Robson's trash can.

8. Johnson admitted that he replied, "Good," when informed that the assault had taken place, but stressed that he only did so because he still feared the other men. Only after Johnson's arrest did he learn that Mullen had not actually been harmed. On cross-examination, Johnson admitted that he had initiated 47 of the 56 personal and telephone contacts made with Howe and Delashaw. Johnson also admitted talking to Howe about his involvement with arms smuggling and his association with an Honduran official, but Johnson maintained that such statements were false. Similarly, he asserted that his statements regarding drug smuggling and gun running were false.

With regard to the plan to harm Mullen, Johnson admitted making statements which could be construed as encouraging harm. However, Johnson stated that he only wanted to scare Mullen. Nevertheless, he acknowledged statements, captured on tape, to the effect that Mullen was an "easy mark," that Johnson liked using an out of town "hit man," that he wanted Mullen injured "for organized crime figures in New Orleans," and that he wanted the Rolex stolen. Johnson denied initiating the plan to steal Mullen's guns. Johnson argues that, after four months of enduring threats, he finally said that Joey should break Mullen's legs, tie his head in a toilet, and steal Mullen's guns. Despite Johnson's assertion that he finally succumbed to the threats of violence, and despite his status as a former police officer, Johnson admitted that he never reported to law enforcement officials that he feared for his life.

and misconduct. The letter further asserted that Howe was the subject of an investigation at the time that the events surrounding this investigation transpired, and that Howe was prohibited from associating with criminal informants or from conducting undercover investigations. Based on this information, defense counsel moved for the production of Howe's personnel file and the FBI guidelines governing the use of criminal informants pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

This motion was denied. The district court ruled that the Government was not required to produce the Guidelines. Agent Howe's file was submitted to the court for an *in camera* inspection. The court, after inspecting the material, held a hearing on the matter after which the court ruled that the material was not discoverable. The documents were sealed by court order.

Johnson argues that the court's failure to compel production of such material constitutes a violation of due process as articulated by the Supreme Court in *Brady.* In that opinion, the Court indicated that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady,* 373 U.S. at 87–88, 83 S.Ct. at 1196–97. The rule set out in *Brady* is a corollary of the proposition that the Government is in the unique position of being an advocate while striving to obtain a just result. *Brady*'s purpose is to ensure that a miscarriage of justice does not occur, "not to displace the adversary system as the primary means by which truth is uncovered." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Balancing these two competing roles of the Government, the Supreme Court in *Bagley* determined that a prosecutor need not deliver his entire file to defense counsel.

Such a broad right of discovery would too drastically alter the present system of criminal justice.

■ Both impeachment evidence and exculpatory evidence fall within the *Brady* rule as "evidence favorable to the accused." Neutral or inculpating evidence is not within the purview of *Brady. United States v. Cochran,* 697 F.2d 600, 605 (5th Cir.1983). The Guidelines are neither exculpatory nor do they contain material which could be used for impeachment purposes. The "Reservation" included in the Guidelines indicates that they

> are not intended to, do not, and may not be relied upon to, create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitations on otherwise lawful investigative or litigative prerogatives of the Department of Justice.

Particularly in light of this disclaimer, defense counsel failed to show how such Guidelines were relevant for the asserted purpose of establishing entrapment or how they could be used to impeach Agent Howe's credibility. No reversible error has been shown.[9]

■ Johnson also fails to demonstrate reversible error resulting from the nondisclosure of Agent Howe's personnel file. Johnson asserted that the material should be disclosed for impeachment purposes. Specifically, Johnson argued that he was denied the ability to inquire into Howe's truth and veracity before the jury.

■ Upon taking the stand, a witness is subject to being impeached in the area of truthfulness. In this case, Howe did not take the stand. Howe, however, was the declarant in several admitted hearsay statements. At oral argument before this Court, defense counsel asserted

> ... in every real sense of the word Agent Howe did take the stand. There were some 198 audio tapes, some twenty-three to twenty-five videotapes of which

---

9. Additionally, *Brady* only requires the production of material evidence. Evidence is material only where there is a reasonable probability that, had such evidence been revealed to the defense, the result of the proceeding would have been different. We cannot conclude that the Guidelines were material.

Agent Howe participated in, either directly or indirectly ... Most of those were played before the jury and so ... his credibility was at issue here.

Defense counsel does not argue that the material withheld was exculpatory in nature. Rather, as indicated, the defense takes the position that the evidence could be used to impeach Agent Howe and would tend to indicate that Johnson was entrapped.

Any information sought for its impeachment value can only be of impeachment use if it is admissible pursuant to the rules of evidence. Here Howe never took the stand, so his credibility was never directly called into question. However, as a declarant in a hearsay statement, evidence tending to impeach Howe's tendency for truth and veracity would be admissible. Fed.R. Evid. 806.

Our focus, therefore, must be on a determination of whether or not the defense was denied access to material falling within the scope of *Brady*. The district court, following an *in camera* inspection of the material requested, concluded that the information was not discoverable. We have also examined the sealed material and reach the same conclusion. Nothing in the file supports the allegations set forth in the anonymous letter. But even if the information could be considered "evidence favorable to the accused" under *Brady*, our result would not differ. No reversible error has been shown. As the Supreme Court stated in *United States v. Bagley,*

> a constitutional error occurs ... only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

*Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381.

Examined in the context of the entire record, there is nothing in the withheld information that tends to undermine confidence in the outcome of the trial. Even had the contents of Howe's personnel file been revealed to the jury, we discern no reasonable probability that the result would have been different.

■ The district court responded properly by conducting an *in camera* investiga-

tion in light of the accusations set out in the anonymous letter; that inspection satisfies our overriding concern with the justice of a finding of guilt. Where the district court's inspection reveals nothing within the scope of *Brady*, the motion for production is properly denied. The prosecutor is not obliged to open up his files to the defendant for an open-ended fishing expedition for *Brady* material merely because of an anonymous letter. The district court took the course most prudent under such circumstances; no reversible error has been indicated.

### B. *Entrapment*

Johnson argues that the district court erred in overruling Johnson's motion for acquittal or new trial based on the finding that entrapment had not been established as a matter of law. Additionally, Johnson argues that the district court abused its discretion in failing to submit Johnson's proffered jury instruction on the definition of "agent." We determine that entrapment was not established as a matter of law, and the district court did not abuse its discretion by refusing the proposed defense instruction.

#### 1. Entrapment as a matter of law

■ Entrapment is an affirmative defense designed to ensure that persons not be held criminally liable for acts which they were induced to commit, without prior predisposition to engage in such activity, by law enforcement officials. In order to be entitled to rely on a defense of entrapment, a defendant must present some evidence that Government conduct created a substantial risk that an offense would be committed by a person other than one ready to commit it. Once this prima facie showing of entrapment has been made, the burden falls on the Government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime, and, therefore, was not entrapped. *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 888, 99 L.Ed.2d 54 (1988), *United States v. Toro,* 840 F.2d 1221 (5th Cir.1988). The relevant focus is on the defendant's predis-

position, intent or willingness to commit the crime prior to any contact with the Government agents rather than on the conduct of the agent. *United States v. Yater*, 756 F.2d 1058 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985).

 When a court determines that no reasonable jury could find, beyond a reasonable doubt, that the defendant was predisposed to commit the crime, then the court may determine that entrapment has been established as a matter of law. Where there is some evidence to support a finding of predisposition, the issue is properly presented to the jury. On appeal from a conviction wherein the jury has rejected the entrapment defense, the standard of review is the same as that which applies to the sufficiency of the evidence. Consequently, this Court must look to the evidence to determine whether, viewing reasonable inferences and credibility choices in the light most favorable to the Government, a reasonable jury could find, beyond a reasonable doubt, that the defendant was predisposed to commit the offense. *United States v. Duvall*, 846 F.2d 966 (5th Cir. 1988).

 In this case, a reasonable jury could find that Johnson was not entrapped. The evidence shows that neither the informant nor the Government knew Mullen prior to Johnson's initiation of the scheme to confront or do harm to Mullen. Although Johnson points to his own testimony indicating that he intended only to have Mullen scared, not harmed, this Court must look to the evidence in the light most favorable to the Government. There is significant indicia in the record that the plan was, and had always been, to harm Mullen. Johnson took an active part in the plan to harm Mullen; much of his enthusiastic support is captured on videotape. Given the presence of Johnson's "unbridled enthusiasm," *United States v. Anderton*, 679 F.2d 1199, 1201 (5th Cir.1982), as well as the absence of overwhelming evidence to the contrary, the district court properly rejected the claim of entrapment as a matter of law. *Duvall*, 846 F.2d 966.

 Johnson argues that, although he may have initiated the encounter with Mullen, the initial suggestion to acquire Mullen's guns was made by the Government. Although the Government disputes this contention, the resolution of this dispute does not affect our ruling. A defendant claiming entrapment must show more than the fact that the Government first solicited him or provided the opportunity for the crime. *United States v. Hill*, 626 F.2d 1301 (5th Cir.1980). As the Government noted at oral argument, an opportunity was provided and Johnson jumped in with both feet. Our focus, however, is not on the creation of the opportunity to commit the crime, but on the defendant's predisposition. In this case, there is evidence indicating that Johnson had prior dealings with weapons, and that Mullen had cheated a friend of Johnson's in a gun deal. Consequently, there was evidence of predisposition both to harm and to acquire the weapons. The district court did not err in submitting the question of entrapment to the jury.

### 2. Jury instruction

At the charge conference, defense counsel gave the district court two versions of a desired entrapment charge. The first version read, in pertinent part,

[y]ou are instructed that the term "agent" and/or "Government agent" means any person acting as a paid informant for the Government or law enforcement officers, or a person working with, for, or in behalf of the Government agents, or a private citizen who is or becomes an unknowing pawn of the Goverment.

The second version was essentially the same, although it excluded the final phrase beginning with "or a private citizen...." Defendant's Proposed Jury Instruction, Record Vol. I at 175, 177. The district court rejected the proposed instructions.

Johnson argues that the district court's refusal to utilize the defendant's proposed instruction was error. A trial court is given broad discretion to fashion jury instructions. This Court will reverse only upon a

determination that the district court has abused its discretion; here no such abuse of discretion has been shown.

The instruction contained in the court's charge was essentially derived from Devitt and Blackmar, *Federal Jury Practice and Instructions* § 13.09 (3d ed. 1977); it recited:

> Where a person has no previous intent or purpose to violate the law but is induced or persuaded by law enforcement officers or their agents, *such as, for example,* a paid informant, to commit a crime, he is a victim of entrapment and the law as matter of policy forbids his conviction in such a case.
>
> On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that the government agents provided what appeared to be a favorable opportunity is not entrapment. For example, it is not entrapment for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction.
>
> If then the jury should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case the Defendant was ready and willing to commit a crime such as those charged in the indictment whenever opportunity was afforded and that the government officers or their agents, *such as* [a] paid informant, did no more than offer the opportunity, then the jury should find that the Defendant is not a victim of entrapment.
>
> On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the Defendant had the previous intent or purpose to commit an offense of the character charged, apart from the indictment (sic) [inducement] or persuasion of some officer or agent of the government, then it is your duty to find him not guilty.

Record Vol. 27; Record Vol. 1 at 31–32.

 Johnson correctly points out that this Court has held that the Govern-

ment may entrap a defendant through the actions of an ignorant pawn. Johnson, however, is incorrect in his assertion that the district court's failure to submit the ignorant pawn/agent instruction to the jury is reversible error. When a defendant properly requests an instruction on a theory of defense that is supported by some evidence, it is reversible error not to adequately present the theory. Here, the theory of defense was entrapment; an instruction on such a defense was presented to the jury. Our review is confined to a determination as to whether the instruction as a whole accurately reflects the law. *United States v. Magee*, 821 F.2d 234 (5th Cir. 1987). The instruction did so; the court spoke of "a paid informant" as an example of an agent, but in no way limited the jury from considering Smith an agent of the Government. Furthermore, although the jury posed several questions during deliberations, including a request for the definition of "inducement," the jury never expressed any confusion as to whether Smith could be considered an agent of the Government. The instruction submitted to the jury was not an improper statement of the law; no reversible error has been shown.

### C. *Evidentiary Rulings*

#### 1. Statements Prior to February 17th

 An out-of-court statement offered to prove the truth of the matter asserted is properly excluded as hearsay. In this case, statements between Delashaw and Smith concerning the procurement of firearms were admitted. These pre-conspiracy statements were admitted over defendant's objection. The Government responded, correctly, that the statements were not hearsay because they were not offered to prove the truth of the matter asserted, but were merely offered to establish the background and developing relationship between the men. The district court properly limited the jury's consideration of these statements as background only. Not being hearsay, no exception need be found.

### 2. Statements after Feb. 17th

Johnson also objected to the admission of certain statements by Smith which were admitted as nonhearsay statements of a co-conspirator. Specifically, Johnson objects to statements made by Smith which include assertions that he, Smith, once killed a girl in New Orleans while testing a gun, that Smith knew about working letter bombs, that Smith was stealing boat parts at Johnson's request, and that Johnson had blown up a boat. The district court admitted the statements pursuant to Rule 801(d)(2)(E) after making the required findings, by a preponderance of the evidence, that a conspiracy existed as to the solicitation of harm to Mullen and the robbery of Mullen's guns, that Johnson and the declarant (Smith) were members of that conspiracy, and that the statement was made in the course of and in furtherance of the conspiracy.

Johnson argues that the statements were improperly admitted because they have nothing to do with advancing the objectives of a conspiracy to get guns by harming Mullen. Pursuant to Rule 801(d)(2)(E), only those statements which were made in furtherance of the conspiracy are admissible as nonhearsay. This Court has indicated that the term "in furtherance" should be broadly construed. *United States v. James*, 510 F.2d 546 (5th Cir.), *cert. denied sub nom. Vasquez v. United States*, 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed. 2d 81 (1975). For example, we have indicated that statements which are puffing or boasts, but which are used to obtain the confidence of the person toward whom the statement is directed, are properly considered to be statements in furtherance of the conspiracy. *United States v. McGuire*, 608 F.2d 1028 (5th Cir.1979), *cert. denied*, 446 U.S. 910, 100 S.Ct. 1838, 64 L.Ed.2d 262 (1980).

In this case, the statements made by Smith concerning himself indicate his prowess with weapons and his ruthless nature. Since Johnson hired Smith to make the hit on Mullen, these kind of statements which tend to indicate the presence of qualities necessary for a hit man, were admissible as boasts made in furtherance of the conspiracy. The statements by Smith regarding Johnson were also admissible as tending to show intent to solicit harm on another. We cannot hold, in light of the above enumerated grounds for admissibility, that the district court committed reversible error by admitting the evidence as statements of a co-conspirator.

### 3. Beechum–Robinson

In addition to Johnson's complaint concerning the admission of the above referenced statements as nonhearsay pursuant to the co-conspirator rule, he argues that the statements are inadmissible under Rule 404(b) as evidence tending only to prove a general predisposition to commit crimes.[10] Federal Rule of Evidence 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The "other purposes" set forth in Rule 404(b) are not exclusive. The statements involved are of the type to which Rule 404(b) speaks. The statements speak to Johnson's intent to solicit the robbery and assault of Mullen while correspondingly contradicting Johnson's assertion that he cooperated in the scheme to harm Mullen because of intimidation.[11]

---

10. In addition to the statements described above, Johnson points to other extrinsic evidence including Johnson's statement that Smith had blown a hole in the yard of a man he suspected was having an affair with his wife, Johnson's statement that he had Smith blow up a car belonging to someone who owed Johnson money, and Johnson's statement that he himself had blown up a bait camp.

11. Rule 404(b) "deals with acts committed by the defendant himself." *United States v. Sepulveda*, 710 F.2d 188, 189 (5th Cir.1983). Consequently, we are concerned only with those statements bearing on Johnson. Statements involving Smith's conduct were previously addressed in the preceding section.

■ Our concern is not with the admission of the statements pursuant to the "other purpose" language of Rule 404(b). Rather, the only potential ground for remand which we discern arising from the admission of these statements would result from the district court's failure to make an on-the-record finding that the probative value of this evidence outweighs the prejudicial effect.[12] We have examined this issue carefully, and for the reasons set forth below, we conclude that no error has been shown.

■ Johnson argues that the district court committed numerous errors in its treatment of this extrinsic evidence. As Johnson correctly notes in his brief to this Court, any proferred extrinsic evidence must first be determined to be relevant to an issue other than the defendant's character, and its probative value must outweigh its prejudicial impact. *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

■ Within the scope of the relevancy determination, the district court must make a finding that the event in fact occurred. *Beechum* at 913. Johnson notes that no independent proof that he committed the alleged acts was introduced. He argues that the jury could not find that the acts occurred, and therefore the ultimate preliminary question of relevance should never have been reached.

■ No "independent proof" was necessary. Whether appellant committed the alleged offenses was a question of fact for the jury; it was to be resolved against the Government only where the jury could not have found the preliminary fact to exist. The testimony of the single witness who related the conversations and confirmed the accuracy of the tapes was sufficient for the jury to find that the conduct occurred. *United States v. Punch*, 722 F.2d 146, 152 (5th Cir.1983); *United States v. Mortazavi*, 702 F.2d 526 (5th Cir.1983).

Further, to the extent that the extrinsic acts were contained in statements uttered by appellant himself, their admissibility was virtually automatic as admissions by a party opponent. Fed.R.Evid. 801(d)(2)(A). Appellant depicted himself as a nonviolent individual who had no intent to physically harm Victor Mullen. He also denied conspiring to transfer weapons, the dangerous propensity of which had been unlawfully heightened by a conversion to automatic firing capability. Appellant's boasts to the effect that he once had Smith destroy a Corvette automobile belonging to someone who owed appellant money, and similar comments involving violence, were relevant to the issues of intent, knowledge, plan and the like whether or not appellant actually had caused the destruction of the vehicle. *See United States v. Walker*, 710 F.2d 1062, 1067 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984).

■ Having determined that the evidence has successfully transcended the relevancy hurdle, we turn now to the district court's failure to make an on-the-record finding that the probative value of the evidence outweighed the prejudicial effect. This Court indicated in *United States v. Robinson*, 700 F.2d 205 (5th Cir.1983), *cert. denied*, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984), that the trial judge's assessment pursuant to Rule 403 that the probative value of the evidence outweighs the prejudicial effect should be on the record. However, absent a specific request by counsel that such an on-the-record finding be made, the trial court's failure to do so does not automatically warrant a remand. *United States v. Merkt*, 794 F.2d 950, 963 (5th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987). Counsel did not contemporaneously press the matter of an on-the-record finding, consequently, no remand for this purpose is mandated.

---

12. Alternatively, we note that the evidence which Johnson complains of was "inextricably intertwined with the evidence used to prove the crime charged." *Sepulveda*, 710 F.2d at 189. Such evidence is not "extrinsic." *See, e.g., United States v. Torres*, 685 F.2d 921 (5th Cir.1982). Consequently, neither 404(b) nor the *Beechum* analysis apply.

Our inquiry therefore turns to whether the district court abused its discretion by admitting the extrinsic offense evidence. No abuse of discretion has been demonstrated. A trial judge is armed with wide discretion in determining relevancy and admissibility in such cases. In this case, the judge felt that any prejudice to the defendant, Johnson, was outweighed by the probative value. We cannot say that this determination was error.

### D. *The Baseball Bat Incident*

During cross-examination of Johnson, the Government's attorney displayed a baseball bat in violation of a prior court admonishment. Johnson's counsel immediately moved for a mistrial, which the district court overruled. Johnson now argues that such a ruling was error, that a mistrial should have been granted because of the highly inflammatory nature of the display, and, because the prosecution goaded defense counsel into requesting a mistrial, that double jeopardy prevents the retrial of appellant Johnson. *See Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct.2083, 72 L.Ed.2d 416 (1982).

Although we agree that the prosecutor should not have displayed the baseball bat, we cannot conclude that such action constituted "prosecutorial overreaching" so as to warrant a mistrial. Prosecutorial overreaching occurs when the Government, through either gross negligence or deliberate misconduct, causes aggravating circumstances to develop which seriously prejudices a defendant to the extent that a continuation of the proceeding would result in a conviction. *Kennedy*, 102 S.Ct. 2083.

During the direct examination of Delashaw, the prosecutor, after the jury had been removed from the courtroom, indicated to the judge that he was considering introducing a baseball bat as demonstrative evidence. Testimony had already been introduced indicating that Joey was going to utilize a baseball bat to break Mullen's legs. The following exchange occurred:

Prosecutor: ... I have not decided to use a baseball bat as demonstrative evidence, but may I ask the Court.

The Court: Let's talk about it before you bring it in.

Prosecutor: Well, it's over here hidden, but I just wanted to ask.

It's a Louisville Slugger and has not been marked.

The Court: Is that the one that he— Okay. Go right ahead.

Record Vol. 19 at 50.

The baseball bat, which was hidden from the jury's view, remained hidden until the cross-examination of Johnson. At that time, the prosecutor removed the bat from its hiding place and placed it on the counsel table. Defense counsel promptly objected, and the following exchange occurred:

Prosecutor: Your Honor, at this time we respectfully move for a mistrial. That was strictly calculated.

The Court: Whatever. It's not on the record.

Defense counsel: Mr. Woodward [the prosecutor] went over behind the podium that was behind the column there and picked up a baseball bat and starting swinging it and showed it and displayed it to the jury.

The Court: I am not sure he swung it. He lifted it up and he went over and placed it on the table, in view of the jury, at the time you got up and objected.

Defense counsel: That's right.

Record Vol. 25 at 17.

The court then dismissed the jury and a brief hearing was held. Thereafter, the court overruled the motion for mistrial. The court did not err in making this determination. The display of the bat on the table was not accompanied by the histrionics implied by the defense. Furthermore, the bat itself was not highly inflammatory, especially in light of the numerous machine guns that had already been displayed before the jury. This is not a situation where the jury viewed a photograph of the victim of a baseball bat assault. Rather, the bat was nothing more than a common item of which the jury members had already formed a mental picture. While we cannot

condone the actions of the prosecutor, neither can we determine that his error in judgment requires reversal of Johnson's conviction.[13] The court admonished the jury on their return to disregard the display and to give it no consideration whatsoever. Our theory of jurisprudence rests on the jury's ability to follow instructions. *See Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). We assume the jury in this case did so.

■ Our final concern in this case is the cumulative effect of the background evidence of arms-dealing between Delashaw and Smith, combined with the display of the baseball bat. At oral argument, defense counsel suggested that the background evidence, which was introduced to clarify the sequence of events for the jury, was really introduced as a subtle tactic to slander Johnson. Having examined the record, we cannot say that the background information, even combined with the unauthorized display of the baseball bat, unduly prejudiced Johnson.

This was a factually complex case. The evidence introduced was essential to the jury's understanding of the two conspiracies: (1) to acquire and convert weapons to fully automatic capability; and (2) to injure Mullen and steal his guns. The jury was limited to considering the pre-February 17 evidence as background only. As noted above, we presume the jury followed such admonishment. Especially in light of the jury's acquittal of Johnson on the first seven counts, there is nothing in the record to indicate that the jury improperly considered the background evidence.

## III. CONCLUSION

Johnson appealed to this Court on numerous grounds. We have reviewed the record in this case, and considered each ground on appeal. Those grounds worthy of discussion are discussed above. We conclude that reversible error has not been

demonstrated; Johnson's conviction is affirmed.

AFFIRMED.

---

13. Furthermore, we do not fully condemn the prosecutor's actions as being in violation of the trial court's earlier ruling. The initial exchange was vague, at best, and we can conceive how the prosecutor could have honestly believed that the trial court had endorsed the use of the bat as demonstrative evidence.