UNITED STATES of America,
Plaintiff–Appellee,

v.

Janice M. STOWELL, a/k/a Jody Annmarie Tucker, Gary Lane Williams, a/k/a Jackson King and Jimmy Wood, Defendants–Appellants.

No. 90–2223.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1991.

Marjorie A. Meyers, Asst. Federal Public Defender, Roland E. Dahlin, II, Federal Public Defender, Houston, Tex., for Stowell.

Dick DeGuerin, DeGuerin & Dickson, Houston, Tex., for Williams.

Jeralyn E. Merritt, Denver, Colo., for defendants-appellants.

Paula Offenhauser, Asst. U.S. Atty., Ronald G. Woods, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before WISDOM, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted the defendants of conspiring to possess and aiding and abetting the possession of more than one hundred kilograms of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). We affirm the convictions of Williams and Tucker. We reverse the conviction of Wood and remand for a new trial because the district court, over objection, refused to instruct the jury regarding multiple conspiracies.

## I.

Confidential informant Alan Bucchino in August of 1988, introduced undercover agent Jeffrey Wendling of the Drug Enforcement Agency to Lewis Michel. Wendling and Michel began negotiations of a deal whereby Wendling would supply an airplane, a pilot, and a landing strip for Michel's plan to smuggle marijuana into the United States. It was ultimately decided that 500 kilograms of marijuana would be flown out of Mexico in the spring of the following year.

In December of 1988, Michel told Wendling that he had been in contact with "Butterfly," the code name for his Mexican supplier, later identified as Jimmy Wood. In March of the following year, Michel informed Wendling that Wood and the prospective purchaser of the marijuana wanted to inspect the airstrip near Houston where the marijuana was to be delivered. DEA agents observed Michel, Wood, and Gary Williams, also known as "Mr. Nervous," travelling to the airstrip shortly thereafter in a maroon Jeep Wagoneer.

Although delivery of the marijuana was originally set for April 5th, the plan stalled because Mexican troops had bivouacked in the area of the airstrip in Mexico from which the flight was to depart. Meanwhile, Wood arrived in Houston driving the same maroon Jeep Wagoneer previously seen at the airstrip. He met with Wendling and Michel at the Manor House Motel to discuss details of the upcoming transaction, such as the packaging of the marijuana and the location of the Mexican airstrip. Michel stated that an associate would drive a blue van to Houston which would be parked at an alternate airstrip in case of an emergency. Wood identified a Chevrolet pick-up truck with a camper on it as the transport for the marijuana. Wood also stated that Mr. Nervous had gone back to Dallas and would return to Houston when they got close.

The Mexican army moved out of the area of the airstrip on April 12th, and a new target date of April 15th was set. Early on the morning of the 15th, Michel met with Wendling and other undercover DEA agents at the airstrip. Michel gave the pilot a bag containing $35,000. The agents then flew off a comfortable distance, turned the plane around, and landed at Houston Intercontinental Airport, where they loaded the plane with 500 kilograms of marijuana taken from a DEA stock pile. They waited a suitable period of time, and then flew back to the airstrip.

Meanwhile, Michel informed Wendling that the blue van had arrived. Wendling and another agent picked up the van, stored it at the alternate strip, and returned to the Manor House Motel where Michel was staying. When they arrived at Michel's motel room, Judy Tucker was in

bed. Michel identified her as the person who had driven the blue van down from Dallas. Wendling commented to Michel that if use of the alternate strip were necessary, there might be a problem since there would be a large quantity of "dope" for the pilot to unload and leave unattended. He stated that they needed something to cover it. At this point, Tucker interjected that there were some blankets in the back of the van that were there to serve that purpose. Wendling and Michel then drove to the airstrip to await the return of the plane.

Williams and an individual named Richard Dyer had gone to a local electronics store in the Jeep Wagoneer. They returned from the store to the Manor House Motel and picked up Wood. DEA agents observing their activities reported that they made two more stops and apparently were rearranging things in the cargo compartment of the vehicle. At one point Williams put what appeared to be a radio antenna on the outside of the vehicle. The three men ultimately arrived at the Residence Inn adjacent to the parking lot of a K–Mart store and began removing unidentified articles from the car and taking them into a room at the hotel. Williams was seen carrying a hand-held radio.

The plane arrived at the airstrip as scheduled, and the marijuana was unloaded into a white van. The van proceeded to a warehouse where the marijuana was packaged, weighed, and loaded into the pick-up with the camper on it. Michel radioed to Wood that he would contact him shortly. Michel and an undercover agent then drove the pick-up truck to the K–Mart parking lot and parked it there. Wendling followed in an undercover car. They met Wood in the K–Mart parking lot and informed him that everything had gone according to plan.

Richard Dyer then came across the lot from the direction of the Residence Inn, got in the pick-up truck, and started the engine. After a few minutes, Williams and Wood pulled up in the Wagoneer and the two cars remained alongside each other for a moment before they left the parking lot together. DEA agents stopped both cars shortly thereafter and arrested Williams, Wood, and Dyer. In a search of the Wagoneer, officers found a mobile phone, a two-meter VHF radio programmed for both police and communicating frequencies, and police scanners. Michel had told Wendling that "Mr. Nervous" would have such equipment in his vehicle. In addition, there was a spiral notebook containing notations of radio frequencies for local law enforcement agencies and notations corresponding to the packages of marijuana. The agents also found a map showing the section of Mexico where the airstrip was located.

Michel was arrested at the Residence Inn. Other DEA agents returned to the Manor House Motel and arrested Tucker. When asked for identification, she responded that her name was Janice Stowell, and she produced identification bearing that name. Officers later searched one of Tucker's bags and found a mailgram sent to her by Michel that referred in Spanish to "a very big problem with 150 watchos" or soldiers.

## II.

■ Tucker contends that there was insufficient evidence to support her convictions. We review the evidence in the light most favorable to the government to determine whether any rational juror could have found beyond a reasonable doubt that Tucker committed the offenses. *United States v. Gallo,* 927 F.2d 815, 820 (5th Cir.1991).

■ The government was required to prove an agreement between two or more persons to violate federal narcotics laws, that Tucker knew of the agreement, and voluntarily participated. *Id.* (citing *United States v. Magee,* 821 F.2d 234, 239 (5th Cir.1987)). Tucker contends that the government failed to show that she was aware of or willfully became a member of the conspiracy. Rather, she argues, the evidence demonstrated only that she associated with members of the conspiracy, which is insufficient to support a conspiracy conviction. *United States v. Lewis,* 902 F.2d 1176, 1181 (5th Cir.1990).

Tucker points out that although negotiation of the transaction had continued for many months, there was no evidence linking her to any of these negotiations. Until a few days before the transaction, Tucker was in jail, and the day of her release was uncertain. She arrived on the scene only on the morning the marijuana was to be delivered, in response to a phone call from Michel the night before. She did not participate in loading or unloading the marijuana, nor in any exchange of money. Nor did she participate in any radio communications or transportation that indicated a connection to the marijuana shipment. Michel testified that he did not tell Tucker that he was involved in a "dope deal."

Nevertheless, four pieces of evidence incriminated Tucker. First, she drove the blue van down to Houston at Michel's request. This van was stored at the alternate airstrip as a back-up vehicle. Second, when agent Wendling asked about how the "dope" could be covered up, she volunteered that there were blankets in the back of the van for that purpose. Third, Tucker had received a mailgram that contained a veiled reference to the problem of the Mexican army camping in the area of the Mexican airstrip. Fourth, she gave the agents a false name when they arrived at the motel room to arrest her.

■ Although the evidence against Tucker is modest and her role in the conspiracy was minor, a rational juror could conclude that Tucker knowingly joined in the conspiracy. By delivering the van, she committed an overt act in furtherance of the conspiracy. Her statement about the blankets indicates that she knew what was going on and supported it. Her use of an alias is probative of consciousness of guilt. The fact that she joined the conspiracy at the last minute and played only a minor role does not preclude her conviction.

■ Tucker also contends that the evidence was insufficient to convict her as an aider and abettor of possession with intent to distribute marijuana. To convict Tucker on this charge, the government was required to show that the defendant associated with the criminal venture, participated in the venture, and sought by action to make it succeed. *Gallo*, 927 F.2d at 822. The association element requires proof that the defendant shared the criminal intent of the principal. *United States v. Casto*, 889 F.2d 562, 565 (5th Cir.1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990). The same evidence that sustains Tucker's conspiracy conviction also sustains her conviction as an aider and abettor. The evidence was sufficient to show that Tucker knowingly committed acts in support of others who were the primary participants in the drug trafficking transaction.

Tucker also contends that the district court erred in allowing the introduction of testimony concerning her use of an alias. We review the district court's determination that this evidence was more probative than prejudicial for an abuse of discretion. *United States v. Kalish*, 690 F.2d 1144, 1155 (5th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

■ This court has "long and consistently held that a defendant's attempt to conceal his identity from an arresting officer by the use of an alias is relevant as proof of consciousness of guilt." *Id.* Tucker contends that her case is different because she abandoned any attempt to conceal her true identity when she was booked. Furthermore, she permitted the agents to enter her motel room even after they had identified themselves as police. Tucker's conduct when confronted by DEA agents may reasonably be construed as an effort to evade apprehension for her participation in the drug conspiracy. The fact that she did not exclude the agents from her room or continue to conceal her identity after her arrest is of little import. Tucker also urges that the police report contained no indication that Tucker had used an alias at the time of her arrest. Lack of written corroboration for the arresting agent's testimony does not render the testimony inherently unreliable.

■ Tucker argues that even if the evidence of her use of an alias was properly admitted, the court was required to allow

her proposed cautionary jury instruction stating essentially that use of an alias alone is insufficient to establish guilt. She relies on *United States v. Stanley*, 765 F.2d 1224, 1237 (5th Cir.1985) for the proposition that the trial court's rejection of a requested instruction is reversible error if the instruction is substantively correct, is not covered by the charge given to the jury, and concerns an important point in the trial so that the failure to give it substantially impairs the accused's defense.

A trial judge has substantial latitude in tailoring instructions. *United States v. Terrazas–Carrasco*, 861 F.2d 93, 95 (5th Cir.1988) (citations omitted). Here, the court adequately instructed the jury to weigh all the evidence, circumstantial and direct, to determine whether it established the defendant's guilt beyond a reasonable doubt.

■ Finally, Tucker argues that the district court erred in denying a mistrial when jurors were shown to lack impartiality. A mistrial may be warranted where there are indications that members of the jury have prejudged the defendant's guilt. *United States v. Heller*, 785 F.2d 1524, 1528 (11th Cir.1986). A trial court's findings of juror impartiality, however, may be overturned only for manifest error. *Mu'Min v. Virginia*, — U.S. —, 111 S.Ct. 1899, 1907, 114 L.Ed.2d 493 (1991).

■ On the third day of trial, the marshal informed the trial judge that one of the jurors had asked another juror whether the defendants knew their home addresses because they were listed on the jury questionnaires. The judge informed counsel for both sides and proposed to instruct the jury that they need not have any concern about their safety since the jury questionnaires provided to the lawyers did not include street addresses. Defense counsel promptly moved to strike the juror in question for cause and alternatively for a mistrial. The trial judge denied these motions and instead interviewed the two jurors who had discussed the matter. The jurors admitted that they had discussed the issue briefly, and that other jurors may have participated in their conversation as well. Both jurors assured the judge that they had not prejudged the guilt of the defendants and that they intended to follow their oath to presume the defendants innocent until proven guilty. They stated that their concern had nothing to do with anything that had happened in the case and that they were motivated by curiosity rather than fear. The judge determined that neither juror had formed any opinion about the merits of the case and that the discussion had been casual and harmless, particularly since it took place before any evidence had been introduced. He accordingly refused to excuse either juror or to order a mistrial.

There was no manifest error here. It was within the substantial discretion of the trial judge to decide not to dismiss these jurors or declare a mistrial. The judge investigated the matter, evaluated the testimony of the jurors in question, and concluded that the incident was harmless. The judge was not required to accept the jurors' assurances that they would remain impartial, *see, e.g., United States v. Casamento*, 887 F.2d 1141, 1187 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), but it was not unreasonable for him to do so.

■ Williams argues that the district court erred in instructing the jury on the issue of entrapment. We review the jury instructions to see "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir.1990) (citations omitted).

■ The entrapment charge in this case is essentially the same as the charge approved by this court in *United States v. Johnson*, 872 F.2d 612, 622 (5th Cir.1989) and *United States v. Martinez*, 894 F.2d 1445, 1450 (5th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 351, 112 L.Ed.2d 315 (1990). It does add an ignorant pawn instruction, but Williams takes no issue with that addition. Williams argues, rather, that the instruction improperly focuses the jury's attention on inducement. It has long been

recognized that the jury's primary focus should be on the defendant's predisposition rather than the conduct of the government. *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973); *United States v. Henry*, 749 F.2d 203, 210 (5th Cir.1984) (en banc); *Johnson*, 872 F.2d at 620–21. Here, the district court's charge properly directed the jury's attention to the defendant's state of mind rather than the behavior of government agents. The instructions stated in relevant part that:

> If then you should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred, respecting the alleged offenses involved in this case, the defendants were ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded and that government agents did no more than offer the opportunity, then you should find that the defendants were not victims of entrapment.

> If the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find the defendant not guilty.

Although this instruction mentions inducement, it sufficiently accents defendant's predisposition to commit an offense. Williams' arguments to the contrary are without merit.

■ Williams also argues that the instructions failed to advise the jury that the burden of proof was on the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. This argument is without merit. The court's instructions state that "the burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped." It was not error for the court to refer to entrapment rather than predisposition when explaining the burden of proof.

■ Williams also argues that the district court erred in its response to a note sent out by the jury during its deliberations. The jury asked, "Can any defendant whom we find was not entrapped become an ignorant pawn of the government and in turn entrap another defendant?" The court responded simply "yes." No request for elaboration was made by the jury. Defense counsel, however, argue that the district court's answer was inadequate because the jury essentially asked for a clarification on the applicable burden of proof. We are not persuaded that the jury's question relates to the burden of proof. The court's response was beneficial to the defense. If the jury needed further help it could have asked another question.

■ For practical reasons born of the necessities of trial, the district court is granted broad discretion in responding to such requests. *United States v. Duvall*, 846 F.2d 966, 977 (5th Cir.1988). It is proper and usually the wise course for a trial judge to limit reinstruction to the specific request made by the jury. Questions posed by a jury are often susceptible of different meanings. There is nothing wrong in responding in a narrow fashion allowing the jury to decide if the answer is responsive. *United States v. Acosta*, 763 F.2d 671, 677 (5th Cir.), *cert. denied*, 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985). The court's concise response was entirely appropriate.[1]

Wood argues that the district court erred by refusing to grant his request for a jury instruction on separate conspiracies. Wood sought to show that although he may have been a member of a conspiracy to *import* marijuana, he was not a member of the conspiracy to possess marijuana with intent to distribute it after its arrival in the United States. The Supreme Court has recognized that these are separate and distinct offenses. *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

---

1. Williams also argues that the court erred in the handling of allegations of jurors impartiality. We have already addressed this contention by Tucker.

This court has repeatedly held that "a defendant is entitled to a multiple conspiracy instruction if he specifically and timely requests such an instruction and his theory has legal and evidentiary support." *United States v. Toro*, 840 F.2d 1221, 1236 (5th Cir.1988); *United States v. Erwin*, 793 F.2d 656, 662 (5th Cir.), *cert. denied*, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986); *United States v. Washington*, 688 F.2d 953, 958 (5th Cir.1982). Of course, we may decide, as a matter of law, that the evidence of multiple conspiracies fails to raise a factual question for the jury. *Toro*, 840 F.2d at 1236; *Erwin*, 793 F.2d at 662. Our discretion is limited, however, to determining "whether there is *any* evidence to support the issuance of the [multiple conspiracies] charge." *United States v. Harris*, 932 F.2d 1529, 1535 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 270, 116 L.Ed.2d 223 (1991).

Wood relies on several statements in Michel's testimony as evidence that there were two separate conspiracies in this case, and that he was not part of the conspiracy to distribute. First, Michel testified that Wood's "coming back [from Mexico] was completely unimportant and it wasn't part of the deal, wasn't necessary, he didn't have any business on this end." When asked whether Wood was one of the people who would have transported the marijuana to other locations in the United States, Michel stated that "Jimmy Wood had no part in the plan." Michel also testified that Wood was not a purchaser of the marijuana and did not assist in unloading the plane, loading the truck, or transporting the marijuana. Agent Wendling testified that Wood's role was as supplier of the marijuana and that he did not participate in any loading or transportation activities. Thus there was some evidence tending to show that Wood participated only in a conspiracy to import and not a conspiracy to possess with intent to distribute. It was therefore reversible error for the trial court to refuse to instruct the jury on multiple conspiracies. *Erwin*, 793 F.2d at 663.

The government maintains that the evidence established that a single conspiracy was established as a matter of law. There was testimony that Wood supplied the pick-up truck with the camper on it for transporting the marijuana after its arrival; that Wood was in constant contact with Williams, the alleged buyer of the marijuana; that Wood was in radio contact with Michel after the marijuana arrived at the airstrip outside Houston; that Wood was present at the K–Mart parking lot when the marijuana was delivered there; and that Wood and Williams left the parking lot in tandem with the truck containing the marijuana. Although this evidence would be sufficient for the jury to find that Wood participated in a single conspiracy to possess with intent to distribute marijuana, it does not preclude a finding that Wood participated only in a conspiracy to import. The jury remained free to credit Michel's testimony that Wood "didn't have any business on this end" and that his presence during the events after the marijuana's delivery was not an indication that he was participating in the distribution conspiracy. The jury could also have disbelieved Wendling's testimony that Wood supplied the pick-up truck and believed Michel's testimony that he had purchased it himself. The jury could have concluded that after the marijuana was flown in, Wood was merely associating with members of the conspiracy to distribute and was not actively participating in their further plans.

This case is therefore distinguishable from *Toro*, where there was no serious doubt about the existence of the defendant's participation in the conspiracy charged against him. 840 F.2d at 1237. In that case, even if there were two conspiracies, the evidence indisputably established that defendant was a member of both of them. This is not true in Wood's case.

The government's reliance on *United States v. Richerson*, 833 F.2d 1147 (5th Cir.1987), is also misplaced. There we explained that there is no requirement that every member participate in every transaction to find a single conspiracy. Rather it is sufficient that parties knowingly partic-

ipate to achieve a common goal. *Id.* at 1154. We recognized in *Richerson* that the jury should decide the question of single versus multiple conspiracies. *Id.* at 1155. Although the evidence supported a finding of a single conspiracy in this case, Wood was entitled to a jury instruction explaining that he could be acquitted if it was found that he was a member of a different conspiracy than the one charged.

Because we find that the district court committed reversible error by refusing to include an instruction on multiple conspiracies, we need not address Wood's other points of error. His conviction is reversed and we remand his case for retrial.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.